[S. F. No. 6555.     In Bank.—January 20, 1914.]

TYNDALE PALMER, OTAY WATER LEAGUE et al., Petitioners, v. RAILROAD COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

WATERS AND WATERCOURSES—PUBLIC UTILITY—RAILROAD COMMISSION— ENFORCEMENT OF REGULATIONS.—The railroad commission is not bound, under the Public Utilities Act (Stats. 1911, p. 55), to investigate alleged abuses and make and enforce regulations for the conduct of a public utility, such as a water company, at the instance of persons who have no interest in the service.

ID.—REFUSAL OF COMMISSION TO ENFORCE REGULATIONS—REMEDY OF PARTY AGGRIEVED.—If the railroad commission wrongfully refuses to enforce regulations for the conduct of a public water supply, the remedy of the aggrieved party is *mandamus,* not *certiorari.*

ID.—APPROPRIATION OF WATERS—NOTICE—DESIGNATION OF PLACE OF USE—DEDICATION TO PUBLIC USE.—The designation in the notices of appropriation of water of the "places of intended use" thereof, under section 1415 of the Civil Code, does not constitute a dedication of such water to public use for the benefit of such places, and thereby entitle persons at such places to demand a proportional share of such water for use on such land.

ID.—NO PROPERTY IN CORPUS OF WATER IN STREAM—REASON FOR RULE.—The reason for the rule that there. can be no property in the *corpus* of the water running in a stream is not that it is dedicated to the public, but because of the fact that so long as it continues to run there cannot be that possession of it which is essential to ownership.

ID.—NATURE OF PROPERTY IN WATER—RIPARIAN RIGHTS.—One may have the right to take water from a stream, even the exclusive right to do so, but in that case he does not have the right to a specific particle of water until he has taken it from the stream and reduced it to possession. It then ceases to be a part of the stream. Such right to the water of running streams as there is under the law is vested entirely in the several riparian owners along its course. It is subject to the common use of all riparian owners, but neither has a specific property in any part of the water while it remains running in the stream.

ID.—NATURE OF PROPERTY IN WATER AS PRIVATE OR PUBLIC.—The waters of a non-navigable stream are in their nature private property, not property primarily devoted to public use. The right to the water of flowing streams in this state, prior to any sale or disposition of lands by the state or by the United States, was vested in the state or in the United States, not in their respective governmental capacities as sovereign and for the common use of the people, but as riparian owners in their respective capacities as landed proprietors. When lands were disposed of by either, the riparian water-rights pertaining thereto passed to the purchaser as a part of that realty; and when they pass from the riparian owner to others by prescription, grant, or consent, they do not by that transfer become impressed with any public use, and it still remains true that there must be a dedication to public use to divest the private right.

ID.—SECTION 1410 OF CIVIL CODE—AMENDMENT NOT RETROACTIVE.—The amendment of 1911 to section 1410 of the Civil Code, whereby all water or the use of water within the state of California is declared to be property of the people thereof, is not retroactive and does not divest rights already vested at the time it was enacted.

ID.—EFFECT OF AMENDMENT TO SECTION 1410 OF THE CIVIL CODE.—The amendment may possibly be effective as a dedication to general public use of any riparian rights which the state, at the time it was enacted, may still have retained by virtue of its ownership of lands bordering on a stream, rights in the stream which it would in such

cases have in common with owners of other abutting land. It cannot affect the riparian rights of the other owners, nor the rights of any person or corporation claiming under them, nor rights previously acquired from riparian owners by prescription, nor rights acquired from the state prior to that time by appropriation under the code, in reliance upon the implied offer of the state to allow its riparian rights to be acquired in that manner.

PROCEEDING to review an order of the Railroad Commission dismissing a complaint presented to it.

The facts are stated in the opinion of the court.

Tyndale Palmer, for Petitioners.

Max Thelen, Douglas Brookman, John M. Eshleman, H. L. Titus, R. G. Dilworth, and H. E. Doolittle, for Respondents.

W. R. Andrews, City Attorney of San Diego, for Intervener.

SHAW, J.—This is a proceeding under section 67 of the Public Utilities Act (Stats. 1911 (Ex. Sess.) p. 55) to review an order of the railroad commission dismissing a complaint which the petitioners filed and presented to the commission.

In their complaint to the commission the plaintiffs alleged that said water company was engaged in the business of distributing and selling water for public use for irrigation, domestic and other purposes in San Diego County, that it has in its possession and control large quantities of water appropriated to said use, that it obtained said water by virtue of notices of appropriation, posted as provided in the Civil Code, in which the Otay Valley was designated as one of the places of intended use, that the several plaintiffs own lands in the Otay Valley below the level of the pipe-lines of said company and within one mile thereof, that their lands require irrigation, that they desire to obtain water from said company for that and other beneficial purposes to be used on their said lands, that they have demanded the same from said company, offering to pay the established water rate therefor, but that the company refused to let them have any water, except on condition that they first deposit the cost of connecting the company's pipes with their lands. They further averred that

they believed that they were legally entitled to receive from said company a portion of said water.

They asked the commission to fix a just rate of charges for such water, to order the company to supply water to them and others entitled thereto at such rates, to direct it to discontinue making any charge to consumers for connecting lines or for meters, and to forbid the company from charging a different rate for domestic use where water was also furnished to the same land for irrigation.

Upon the hearing it was agreed that the commission should first ascertain and determine whether or not the plaintiffs had the right to receive from the company the water they claimed. The principal dispute and the only matter of importance was the claim of the plaintiffs to receive water from the company for irrigation. Some three or four of them were and still are receiving water from the company for domestic use, but as we understand the record, the commission found that they were still entitled to receive the water for that purpose, and so declared. The grievances relating to that use were not deemed of sufficient importance to justify an inquiry at that time by the commission, and it did not decide that no such right thereto existed. Upon the claim that the plaintiffs were entitled to water for irrigation, the commission, upon the evidence, determined that they did not have such right and thereupon and for that reason refused to proceed with the application and dismissed the complaint.

We need not determine here whether or not the commission has judicial power authorizing it, in the course of its duties and for the purpose of determining whether or not it will entertain a complaint presented to it, to make an adjudication of the right of the complainants to the water service of which they ask regulation, or that the decision in this case is such an adjudication. If it appears upon the showing made to the commisssion and before this court that they had no such right thereto, the action of the commission in dismissing the proceeding should be sustained, regardless of the extent of the judicial power it may have. The commission is not bound to investigate alleged abuses and make and enforce regulations for the conduct of a public utility at the instance of persons who have no interest in the service. If it wrongfully refuses to do so, the remedy of the aggrieved party would be

*mandamus,* not *certiorari. Mandamus* is allowed by section 67 of the Public Utilities Act, for such refusal. We are of the opinion that the complainants, upon the showing made, have no right to receive water for irrigation of their lands. It may be that they still retain the right to an adjudication by a competent court, notwithstanding the decision of the commission and of this court in this proceeding.

The sole ground upon which they claim the right to a share of the water for such irrigation is that their lands are included in the places designated in the notices of appropriation posted by the company as the "places of intended use" of the water claimed in such notices. The theory of the plaintiffs is that this designation of places of intended use constituted a dedication of the waters claimed in the notice to public use for the benefit of all the territory embraced in the designated places, and that when water was thereafter diverted in pursuance of the notices, the persons owning lands within any of the places named have the right to demand a proportional share of such water for use upon such land. In this connection, plaintiffs argue that the waters flowing in non-navigable streams in this state are by law deemed "public waters," devoted to public use for the benefit of the lands, whether contiguous or not, to which they can conveniently be conducted by artificial means; that it was perceived by the legislature that in many places the supply of water would be far too small to serve the entire accessible area and that some method must be devised of determining the limits to which the dedication should extend; that for this purpose the provision was made in the Civil Code, requiring the person claiming the water and posting the notice to designate the place of use; and that it was intended that thereby the right to the supply should be divested from the general area of lands accessible to the supply and vested exclusively in the places designated.

The theory that the water of a non-navigable stream in this state is in some sense "public water" has been advanced before. It has been claimed that a diversion of water under the provisions of the Civil Code (secs. 1410 to 1422) constitutes a grant of the water by the state to the appropriator. The idea may have arisen from the statement sometimes made in the decisions that the riparian owner has no right in the

*corpus* of the water (*Eddy* v. *Simpson*, 3 Cal. 252, [58 Am. Dec. 408], and that running water cannot be made the subject of private ownership, that the right to use the water of a stream ''carries no specific property in the water itself.'' (*Kidd* v. *Laird,* 15 Cal. 179, [76 Am. Dec. 472].) This is far from saying that the property in the water is vested in the public, either for general use, or as property of the state. The doctrine that it is public water, or that it belongs to the state because it is not capable of private ownership, has no support in the statutes of the state or in any decision of this court.

The true reason for the rule that there can be no property in the *corpus* of the water running in a stream is not that it is dedicated to the public, but because of the fact that so long as it continues to run there cannot be that possession of it which is essential to ownership. It is in this respect similar to the air, which cannot be said to be possessed or owned by any person unless it is confined within impervious walls. One may have the right to take water from the stream, even the exclusive right to do so, but in that case he does not have the right to a specific particle of water until he has taken it from the stream and reduced it to possession. It then ceases to be a part of the stream. Such right to the water of running streams as there is under the law is vested entirely in the several riparian owners along its course. It is subject to the common use of all riparian owners, but neither has a specific property in any part of the water while it remains running in the stream. The United States, with respect to the lands which it owns in this state, is a riparian proprietor as to the streams running through such lands. It is only by virtue of that fact that it has any right or power of disposition over the waters thereof. And its right and power in that respect is no greater and no less than that of any other riparian proprietor. By the act of July 26, 1866 (14 U. S. Stats. 251), the United States consented that private persons might acquire rights to water flowing in streams through its lands by taking possession thereof, that is, by diverting the same, in such manner as should be provided by the laws of the particular state. Where such diversion had not been made, a grant of its lands by the United States to a private person without reservation, would carry with it the riparian rights pertain-

ing to that land in streams flowing through it, in the same manner as in the case of a grant of land by a private owner. So, also, the state, with respect to the lands it owns which are not devoted to a specific public use, is in the same category as any other landowner. It has riparian rights with respect to such land in the streams running over it, which its grant carries to the grantee. The provisions of the Civil Code above mentioned have the effect of a declaration by the state that any person who may divert water from a stream in pursuance of those provisions will thereby obtain a right in the stream paramount to the riparian rights which the state may have therein by virtue of the fact that the stream may run over lands then belonging to the state. To that extent it operates as a grant from the state, but this is only because the state had the riparian right, and not because the water was in any sense public water devoted to public use.

These questions received elaborate treatment in the leading case of *Lux* v. *Haggin,* 69 Cal. 255, [4 Pac. 919, 10 Pac. 674]. On page 390 [of 69 Cal.] the fundamental principle is thus stated: "The right of the riparian proprietor to the flow of the stream is inseparably annexed to the soil, and passes with it, not as an easement or appurtenance, but as part and parcel of it." If this be true, then the right to the water is no more public than the right to the land. As to the title of the United States, it is said on page 336 [of 69 Cal.] : "The lands of the United States (not reserved or purchased for fortifications, etc.) are held, since the admission of the state into the Union, as are held the lands of private persons, with the exception that they are not taxable." It is further shown that even if it be conceded that prior to the cession from Mexico the government of that country possessed a title to the waters, or a power over them, which was in some respects public in its nature, a point not decided, nevertheless this title passed to the United States by the cession from Mexico, and afterward, by the admission of California to the Union, passed from the United States to the state of California, and that the act of April 18, 1850, adopting the common law as the law of this state, "should now be held to have operated (at least from the admission into the Union) a transfer or surrender to all riparian proprietors, of the property of the state—if any she had—in innavigable streams and the soils below them."

(69 Cal. 338, [10 Pac. 721].)   The riparian owners here re-
ferred to were the United States, the state itself with regard
to school lands and other lands received from the United
States, and the then existing purchasers from either of them.
It also declares (69 Cal. 372, [10 Pac. 741]) : "As we have
seen, one who, since the acts of Congress of 1866 and 1870,
receives a grant of a portion of the public lands of the United
States, without special or implied reservations, takes subject
only to appropriations of water made or initiated prior to the
grant." Referring to the effect of an appropriation with
respect to state lands, it is said (69 Cal. 374, [10 Pac. 743]) :
"The state had granted the waters running to its own lands,
by authorizing the diversion of waters from its lands (refer-
ring to the Civil Code provisions), and doubtless such grantees
acquire the state property in the waters whenever the state
has a property in the waters at the time of the grant." The
case then proceeds to state the reasons for the adoption of
these provisions of the code. As these seem now to be mis-
understood by many, it may be well to again state the condi-
tions which led to the enactment and the purpose sought to
be attained.

At the time of the admission of California to the Union
and for many years afterward the lands embraced within its
limits, excepting the Mexican grants, which were located
mainly in the valleys, were, for the most part, the property
of either the United States or of the state. There was urgent
need for the use of the waters of the streams, especially in the
mining operations which then constituted the main resource
of the state. There were no laws provided whereby the right
to divert and use these waters could be acquired from the
state or from the United States. Both sovereignties, however,
permitted such diversion by any one who could put the water
to beneficial use. Diversions were accordingly made and im-
mediately there began to arise disputes relating to interfering
diversions from the same stream, which speedily found their
way into the courts and it became necessary to ascertain the
rules of law by which claims of that kind were governed. An
analogy was found in the rules of the common law relating
to controversies over the possession of land between persons
who had no title thereto and in which the real owner did not
interfere or intervene. (See *Katz* v. *Walkinshaw,* 141 Cal.

135, [99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74
Pac. 766].) It was held that, since the real owner of the
water-rights, that is, the United States or the state, permitted
these diversions and was not in court to assert its rights or
to be bound by the decision, the matter between the persons
litigating was to be decided according to the rules of law in
regard to priority of possession of land. The diversion of
the water was declared to be the equivalent of possession and
the doctrine was laid down that he who was first in time
was first in right. But it soon appeared that valuable rights
were involved before there was or could be an actual diver-
sion. The making of a dam was necessary before water could
be taken, and this frequently required considerable time and
the expenditure of large sums of money. It was necessary to
define the rights which accrued from the labor and expense
of constructing the diversion works, with respect to different
works began about the same time and before any actual di-
version by either claimant. To meet this condition, the courts
held that the person who first began the construction of such
works and did so in such manner that his intent to divert
water thereby was manifest, was entitled to priority in the
diversion subsequently made by him, provided he acted in
good faith and prosecuted the work with reasonable diligence.
The cases stating this doctrine are cited in *Inyo C. W. Co.*
v. *Jess,* 161 Cal. 519, [119 Pac. 934]. Difficult questions of
fact would also arise with respect to the actual dates of the
beginning of work on the conflicting claims, questions which
would generally have to be determined after the lapse of years
and when the dates could not be satisfactorily ascertained.
And it was also found that frequently a person intending to
divert water would be put to great expense in the mere prep-
aration necessary to begin the work and before any actual and
visible operations upon the stream itself could be initiated.
The provisions of the Civil Code, particularly section 1415,
requiring the posting of a notice, section 1416, allowing sixty
days within which to begin the ''excavation or construction
of the works,'' and section 1418, declaring that upon compli-
ance with the code the claimant's right would relate back to
the time of the posting of the notice, were made to remedy
and remove the practical difficulties which previously existed
in adjudicating the rights of hostile claimants under these cir-

cumstances. (*Inyo . C. W. Co.* v. *Jess,* 161 Cal. 519, [119 Pac. 934].) There is absolutely nothing in this statute to indicate that the legislature supposed that the appropriation made in pursuance thereof was in the nature of a grant by the state of any property of the state in the water of the stream from which the diversion was to be made. As stated in *Lux* v. *Haggin,* 69 Cal. 255, [4 Pac. 919, 10 Pac. 674], the statute was a consent by the state to the taking of the water so far as it infringed upon the riparian rights of the state by virtue of any lands which it might own situated upon the stream, and to that extent it operated as a grant. But that was a grant of a right which was private in its nature, a right pertaining to the particular tracts of land owned by the state and held by the state only because of such ownership. It was not a general right to the waters of the stream as a whole. And unless it happened that the state owned land upon the stream at the time of the diversion, a condition which in fact seldom occurred, the state would part with no right whatever by the appropriation. As we have seen, there was no existing public right in the waters which the state could transfer to the appropriator. The whole purpose of the statute was to provide evidence whereby parties claiming under hostile diversions could establish their respective priorities and corresponding rights to the water and avoid the former difficulties in establishing the precise date of the inception of their respective enterprises. (*Inyo etc. Co.* v. *Jess,* 161 Cal. 520, [119 Pac. 934].)

The appropriator under the code obtains no title at all by his appropriation, as against any one except the state and the United States. Such right as he obtains from these he receives because of the fact that by the law of 1866 and by the provisions of the code, the United States, and the state, respectively, have consented that he shall thereby obtain the rights pertaining to any public land over which the stream may run, and not because of any existing dedication of such waters to public use, or because of the fact that they are held by the United States or by the state for general public use. As against all other persons then interested in the riparian lands or in the water of the stream, he must acquire the right he claims in some other way than by the mere appropriation in compliance with the code. He may do so by purchase and

grant from such other claimants and owners, or he may do so by prescription, that is, by adverse use for the period of five years without interruption by the real owner. The only aid which his appropriation notice will afford him in establishing title by prescription against the riparian owner is that it may be admissible as evidence tending to show the date of the beginning of his hostile diversion. In suits against others as mere appropriators, it establishes the date of the inception of his right.

The proposition that the waters of a non-navigable stream are in their nature private property and not property primarily devoted to public use is not only established by authority; it is demonstrable from well-established principles of the law of real property. The right to the waters of a stream is real property, a part of the realty of the riparian lands originally, and a part of the realty as an appurtenance to any other lands to which it may be rightfully taken when the riparian rights have been divested in favor of the user on nonriparian land. This was decided as early as *Hill* v. *Newman,* 5 Cal. 446, [63 Am. Dec. 140], where the court said: "The right to water must be treated in this state as it has always been treated, as a right running with the land, and as a corporeal privilege bestowed upon the occupier or appropriator of the soil; and as such, has none of the characteristics of mere personalty." (See, also, *Lux* v. *Haggin,* 69 Cal. 392, [4 Pac. 919, 10 Pac. 674]; *Santa Paula* v. *Peralta,* 113 Cal. 43, [45 Pac. 168]; *Stanislaus W. Co.* v. *Bachman,* 152 Cal. 725, [15 L. R. A. (N. S.) 359, 93 Pac 858]; *Shurtleff* v. *Kehrer,* 163 Cal. 26, [124 Pac. 724]; *Merritt* v. *Los Angeles,* 162 Cal. 50, [120 Pac. 1064]; *Copeland* v. *Fairview etc. Co.,* 165 Cal. 148, [131 Pac. 121].) Until some change is made in natural conditions, there is no existent right to the water of a stream, except that vested in the riparian owners. They alone can lawfully have access to the stream, and therefore they only, in a state of nature, may lawfully use it or divert it from the stream. Hence, the right to the water of flowing streams in this state, prior to any sale or disposition of lands by the state or by the United States, was vested in the state or in the United States, not in their respective governmental capacities as sovereign and for the common use of the people, but as riparian owners in their respective capacities as landed

proprietors. These rights were and still are strictly proprietary and in their nature private. When land was disposed of by either, the riparian water-right pertaining thereto passed to the purchaser as a part of that realty. It necessarily remained a private right, since the sale did not have the effect of dedicating it to public use. All these rights belong primarily to the riparian owners, consisting of the United States, the state, and purchasers from one or the other of them. They cannot be divested from these riparian owners, and have not been divested from them, except by their consent, expressed, as by statute or by actual grant or contract, or implied, as by prescription; or by enforced taking for public use, as by condemnation. It follows that they remain private property when they pass to purchasers, and that when they pass from the riparian owner to others by prescription, grant, or consent, they do not by that transfer become impressed with any public use and it still remains true that there must be a dedication to public use to divest the private right. They are no more public than is the land to which they belonged and of which they formed a part.

Finally, on this point, the decisions in this state are to the same effect. *Lux* v. *Haggin*, we have already mentioned. The recent case of *Thayer* v. *California Development Co.*, 164 Cal. 125, [128 Pac. 21], states the rule to be that the right obtained by an appropriation under the code, is a private right, that the waters appropriated are not thereby appropriated to public use, and that they remain private property until the appropriator dedicates them to public use, which he may do or not at his own pleasure. The other cases holding this doctrine directly or in effect are cited in that case.

The result of these conclusions is that the Southern California Mountain Water Company did not dedicate the appropriated waters to public use by posting these notices, that whatever dedication it may have made of the waters to public use was made in some other manner and that the territory to which that water is dedicated is not necessarily the same as the places of intended use named in the notices. That territory being far in excess of that which the water could supply, the dedication would be manifested by the act of carrying the water to some place and there selling it to those who apply, or by agreeing to supply some specified district with

the water. The company has not supplied, or agreed to supply, the plaintiffs with water for irrigation. The water it has, according to the findings of the commission, is necessary to supply the inhabitants of the city of San Diego. It follows that the plaintiffs have no right to receive additional water from this supply for purposes of irrigation upon their lands and that the order dismissing the proceeding is not injurious to them.

The order of dismissal is affirmed.

Henshaw, J., Lorigan, J., Melvin, J., and Angellotti, J., concurred.

Rehearing denied.

In denying a rehearing the court rendered the following opinion on February 19, 1914:

THE COURT.—In a petition for rehearing the plaintiffs quote the opening clause of the amendment of April 8, 1911, [Stats. 1911, p. 821], to section 1410 of the Civil Code. The section formerly read as follows: "The right to the use of running water flowing in a river or stream or down a cañon or ravine may be acquired by appropriation." By the amendment this was prefaced by the following declaration: "All water or the use of water within the state of California is the property of the people of the state of California." This, it is claimed, is contrary to the doctrine declared and followed in the opinion of this court herein. This section was not cited in the briefs upon which the case was submitted. We refer to it now solely in order to show that it has no application to the case. All the water-rights which were in dispute in the case arose and were acquired by and under appropriations made long before the passage of the amendment aforesaid. It ought not to be necessary to remind any one that a law of this character is not retroactive, or that it cannot operate to divest rights already vested at the time it was enacted. The amendment may possibly be effective as a dedication to general public use of any riparian rights which the state, at the time it was enacted, may still have retained by virtue of its ownership of lands bordering on a stream, rights

in the stream which it would in such cases have in common with owners of other abutting land. It could not affect the riparian rights of the other owners, nor the rights of any person or corporation claiming under them, nor rights previously acquired from riparian owners by prescription, nor rights acquired from the state prior to that time by appropriation under the code, in reliance upon the implied offer of the state to allow its riparian rights to be acquired in that manner, as indicated in the opinion.

The petition for a rehearing is denied.