[Civ. No. 4872.   Third Appellate District.—April 23, 1934.]

CHARLES E. HAND et al., Respondents, v. A. CARLSON et al., Appellants.

White, Miller, Needham, Harber & Mering for Appellants.

Treadwell, Van Fleet & Laughlin and Charles L. Gilmore for Respondents.

PULLEN, P. J.—This is an action brought by plaintiffs to have it decreed that they are entitled, by prior appropriation, to the waters of a stream in the county of El Dorado known as Johnson's north canyon. This stream rises to the east of all of the lands here involved and flows into the south fork of the American River at a point below all of the lands and points of diversion herein referred to. The flow in Johnson's north canyon is, like that of many of the streams in the foothills of California, variable, and while early in the spring carries a considerable amount of water, it diminishes rapidly with the progress of the season so that in the dry summer months when water is most needed for irrigation there is but a limited volume in the stream.

The judgment herein establishes a joint right by appropriation in the three plaintiffs in 63 miners' inches of the natural flow of the waters of Johnson's north canyon during the period of each year from the fifteenth day of April to the 1st of November and a winter use of 10 inches during the period from November 1st to April 15th, the 63-inch right being subject only to a first right in the Hoys to the use of 8 inches of water, 2 inches for irrigation under a certain ditch, 2 inches for domestic purposes and 4 inches as booster water to be returned immediately to the stream to operate a hydraulic ram. The rights of Carlson, Bradshaw and Phillips in the water of north canyon, who had constructed a dam and sump in the bed of the canyon and were pumping water therefrom to their orchards, are made subordinate to the right of plaintiffs in the 63 inches. The court also established certain riparian rights of John P. Cleese.

This appeal is from the judgment and is taken by all of the defendants, and as grounds therefor they claim the original appropriation of plaintiff, if any, has been abandoned; that defendants Hoy and their predecessors di-

verted all of the summer flow of the water in. question through their ditch, and therefore the evidence does not support the claim of plaintiffs to a preferential right in the water. Appellants also contend that plaintiffs' appropriation was not made on the public domain, and therefore is not superior as against upper riparian lands subsequently patented. Appellants also attack the decree giving plaintiff Cleese riparian rights in the flow of the stream, and question also certain items of cost.

The initial appropriation of the waters of Johnson's north canyon was by J. C. Johnson, the earliest predecessor in interest of plaintiffs Sarah Celio and Charles E. Hand, who in 1861, for the purpose of mining his lands, constructed a ditch leading out of the north canyon, across the Maxwell ranch now owned by John P. Cleese, to the Johnson ranch, now owned by Celio and Hand.

In 1864, Michael Maxwell, the earliest predecessor of John P. Cleese, was granted the right by Johnson to take water from the Johnson ditch for irrigation and agriculture only in return for a right of way and for his assistance in reconstructing the ditch.

The common point of diversion of the appropriative claim of the plaintiff and their predecessors, which the court found was begun in 1861, is in section 36, township 11 north, range 11 east, Mount Diablo base and meridian. By act of Congress March 3, 1853, the sixteenth and thirty-sixth sections of each township of the public lands in California were granted to the state for school purposes. These lands were not immediately surveyed, and it was not until May 4, 1871, that this particular section 36 was surveyed. The land of Carlson, lying in section 6 and upstream on the west branch of Johnson's north canyon, above the point of diversion of plaintiffs, was filed on subsequent to 1861, but some years prior to 1871. The land of Phillips and Bradshaw lies in section 5 and still further upstream and was filed on in 1870 and patent issued thereon in 1882.

This becomes important in that defendants here contend that under the act of Congress to which we have just referred, title to section 36 passed to the state of California immediately, or at least section 36 was no longer a part of the public domain of the United States after the act of 1853. On the other hand, it is the claim of plaintiffs that

title did not pass to the state of California until the time of actual survey. Under the provisions of an act of Congress of 1866, all appropriations of water on public lands then effective (1866) were recognized, and a subsequent patentee of the lands took subject to the appropriation. Therefore, if title to section 36 passed to the state of California at the date of the passage of the act in 1853, the subsequent act of 1866 confirming existing appropriations on the public domain would here be of no effect; but if, as claimed by plaintiffs, section 36 remained a part of the public domain until finally surveyed in 1871, then the act of 1866 would inure to the benefit of plaintiffs.

The trial court found that the original appropriation by the predecessor of plaintiffs began in 1861 and ever since that time plaintiffs and their predecessors have continuously appropriated and beneficially applied 63 inches of the summer flow of said waters upon their lands.

Let us first examine this questioned finding. In determining the amount of water appropriated by the early users we must expect to find in practically all cases, and this case is no exception, a considerable amount of vagueness and uncertainty. The evidence comes from the lips of witnesses advanced in years who are testifying as to conditions extending back many years; they are often giving their boyhood recollection of conditions that probably at that time made no particular impression upon their minds; the capacity of the ditches and the volume of water flowing therein, the times and nature of use, the dates of construction and changes of improvements and conditions. However, it seems to be quite clearly established in this case that the ditch diverting the water from Johnson's north canyon was constructed in 1860, passing through the Maxwell ranch to the Johnson ranch where mining was being carried on. At that time the winter flow was in excess of 100 inches and during the summer it varied from 35 inches or 40 inches to as low as 10 inches. Its earliest use was for mining on the Johnson ranch with a small amount diverted for a family garden and domestic use. On the Maxwell ranch the use was restricted to agricultural and domestic use and it appears that as the mining operations ceased on the Johnson ranch more and more of the water was diverted to the Maxwell ranch for the agricultural and

domestic uses of that property. Mining ceased about 1884, although it was testified that the Chinese continued to mine until about 1889, although the amount of water then used is not given.

George Johnson, one of the witnesses, testified that he knew the ditch in question since its construction in 1860 and that it had remained the same size throughout the period of time with which he was acquainted. He was not able to state the quantity of water in inches, but he did state that in the winter-time the full capacity of the ditch was carried for mining operations and that in the summer-time the entire flow of the canyon was diverted into the ditch for their irrigation and household use. Other witnesses testified that a garden was maintained on the Johnson place and that a meadow was flooded in order to produce a crop of meadow hay. On the Maxwell or Cleese ranch the water was used for domestic and agricultural purposes, the watering of livestock and the production of meadow grass, and irrigation of a small orchard.

In the early history of the community but few orchards were planted, but from time to time additions were made to the small family orchard on the Cleese ranch until about 1920 when large plantings were made and there are now approximately 13,000 fruit-trees under cultivation.

As to the capacity of the ditch and the amount of water available and used, the record discloses that the volume varied from a flow in excess of 100 inches in the early spring to an amount varying from 25 inches to 10 inches in the summer, and sometimes in September it would diminish to a point where there would not be sufficient water at the head of the ditch to reach the Johnson or Maxwell ranches in the afternoon. As to the capacity of the ditch, we have testimony from several witnesses that the size remained the same from its original construction to the date of trial, except perhaps a certain wooden flume which certain witnesses testified might have at one time been larger than at the time of trial. To convert the capacity of the ditch in terms of miner's inches plaintiffs called an expert who measured the flow and capacity of the ditch and flume and found the ditch would divert and carry 96 miner's inches and that the flume would carry 67 miner's inches. As to the use to which the water was put, the record dis-

closes in the early history of the canal the water was used primarily for mining. Apparently hydraulic mining was the method used as long as the seasonal flow permitted, but whether other methods were employed the record does not disclose. In addition to this seasonal use the water was also used during the winter months for domestic purposes and for the watering of livestock on the Johnson and Maxwell ranches, the need for which requiring from 8 to 10 inches of water during the winter months. Also water was applied to certain meadow lands on the Johnson and Maxwell ranches during the spring and winter months as available. As to the summer use the record discloses the domestic needs, and water for livestock and a garden on the Maxwell ranch of from 4 to 6 acres in extent, and also about 3 acres of meadow on the Johnson ranch, which were irrigated during the early spring and winter, and also later if water was available for that purpose. On the Maxwell ranch also, from the beginning, was a small family orchard which was gradually extended until about 1920 when all available water was taken from the garden and meadow and applied to the orchard, together with an increased winter water used for spraying and an additional domestic use made necessary by the increased number of employees living on the ranch required in the carrying on of orchard operations.

This we believe is a sufficient summary to show that the winter flow to the amount awarded by the court has always been diverted and put to a beneficial use upon the properties of plaintiffs and that to the full extent of the full summer flow not exceeding 63 inches has been continuously applied to the ranches for a beneficial purpose. Although abandonment was charged by defendants, we find no testimony of such in the record, but, on the contrary, all of the witnesses who were interrogated upon that issue testified that the water was always used and that neither the ditch nor the diversion was ever abandoned. ■ Also a change of use, as in the instant case, a change from a mining to an agricultural use, will not impair a vested right. (*Davis* v. *Gale,* 32 Cal. 26 [91 Am. Dec. 554] ; *City of San Bernardino* v. *City of Riverside,* 186 Cal. 7 [198 Pac. 784] ; *Senior* v. *Anderson,* 130 Cal. 290 [62 Pac. 563].)

Appellants next contend that all of the summer flow of the water from the canyon was diverted through the canal above the Johnson ditch and into the Davey ditch and used by defendant Hoy. As to this it appears that this water irrigated about an acre or two of garden below the Davey ditch, and some was used for household purposes and the balance ran back into the channel of Johnson's north canyon.

The court has adequately taken care of the rights of defendant Hoy, granting him a right superior to plaintiffs for their necessary use. Defendants also objected to plaintiffs' storage of winter flow in the Johnson canyon subsequent to 1921, but inasmuch as the court did not consider this salvaged winter water in its determination we shall not consider it here. Furthermore, the issues in this case are not framed to raise any issue as to the right to store winter water and the question is not before us. We are here concerned with the rights of plaintiffs in the natural flow of the. stream as beneficial use. It further appears that defendants were not injured by such reservoiring as the reservoirs were entirely below the lands of the defendants and the combined use of the natural flow, together with the accumulated winter flow was not excessive for the use required by plaintiffs.

So, also, as to the objection of defendants as to that portion of the decree giving John P. Cleese riparian rights in the natural flow of the canyon. This action was not brought as was the case of *Cowell* v. *Armstrong,* 210 Cal. 218 [290 Pac. 1036], to apportion waters among the riparian owners, but the finding was merely incidental, preventing the reservoiring by defendants of water for future use which was a nonriparian right as against plaintiff John P. Cleese, a riparian owner. (*Herminghaus* v. *Southern Cal. Edison Co.,* 200 Cal. 81 [252 Pac. 607]; *Seneca Consolidated Gold Mines Co.* v. *Great Western Power Co.,* 209 Cal. 206 [287 Pac. 93, 70 A. L. R. 210].)

This now brings us to the question raised by appellants that the original appropriation of Johnson was ineffectual because the point of diversion was located upon a school section, the title to which passed from the federal government to the state prior to the date of the location, and therefore the appropriation was made subject to all

rights in the owners of the upstream lands. We do not believe we are here concerned with whether the grant of school land was a grant *in praesenti,* for conceded that it was, as ably argued by appellants, still it passed to the state of California, which before the initiation of any right thereto on the part of any grantor of defendants the state of California had subjected its proprietary interest in such land to the appropriation and diversion of waters by plaintiffs' grantor and recognized the diversion and ditch rights then established on section 36. (Stats. 1871, p. 622; Civ. Code, secs. 1410 et seq.; *Wood* v. *Etiwanda Water Co.,* 122 Cal. 152 [54 Pac. 726]; Id., 147 Cal. 228 [81 Pac. 512]; *Palmer* v. *Railroad Commission,* 167 Cal. 163 [138 Pac. 997]; and *Lux* v. *Haggin,* 69 Cal. 255 [4 Pac. 919, 10 Pac. 674].)

Lastly, appellants insist that the judgment includes improper items of costs and should therefore be reversed. In due time plaintiffs filed their cost bill, followed by a motion by defendants to retax. The court struck out certain items in the memorandum of costs and sustained others and fixed the costs at $314.90. By a clerical error the full amount of the costs claimed by plaintiffs was inserted and that amount now appears in the judgment rather than the amount at which the same were taxed by the court. ▮▮ An order on a motion to retax costs made after the rendition and entry of final judgment is appealable as a special order and is not reversible on an appeal from judgment. (*County of Contra Costa* v. *Cowell Portland Cement Co.,* 126 Cal. App. 267 [14 Pac. (2d) 606]; *Empire Gold Min. Co.* v. *Bonanza Gold Min. Co.,* 67 Cal. 406 [7 Pac. 810]; *Hennessy* v. *Superior Court,* 194 Cal. 368 [228 Pac. 862].)

▮▮ The trial court has the inherent power to correct its record so that it shall conform to the actual facts and speak the truth. (*Kaufman* v. *Shain,* 111 Cal. 16 [43 Pac. 393, 52 Am. St. Rep. 139]; *Crim* v. *Kessing,* 89 Cal. 478 [26 Pac. 1074, 23 Am. St. Rep. 491].) Therefore the remedy of appellants lies in an application to the trial court, which, upon proper notice, will undoubtedly correct the error of which complaint is here made.

Other points are urged for reversal, but we believe what has been already said is determinative of the questions here involved and, finding no error, the judgment is affirmed.

Thompson, J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 23, 1934, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 21, 1934.