44 Cal.3d 448 (1988)
749 P.2d 324
243 Cal. Rptr. 887
In re Determination of Rights to WATER OF HALLETT CREEK STREAM SYSTEM.
STATE WATER RESOURCES CONTROL BOARD et al., Petitioners and Appellants,
v.
UNITED STATES OF AMERICA, Claimant and Respondent; SIERRA CLUB, INC., Intervener and Respondent.
Docket No. S.F. 25133.
Supreme Court of California.
February 18, 1988.
*453 COUNSEL
John K. Van de Kamp, Attorney General, R.H. Connett, Assistant Attorney General, Roderick E. Walston and Clifford T. Lee, Deputy Attorneys General, for Petitioners and Appellants.
Kronick, Moskovitz, Tiedemann & Girard, Janet K. Goldsmith, Edward J. Tiedemann, A.B. Ewell, Jr., and Gary W. Sawyers as Amici Curiae on behalf of Petitioners and Appellants.
F. Henry Habicht II, Assistant Attorney General, Roger J. Marzulla, Deputy Assistant Attorney General, Donald B. Ayer, United States Attorney, Sandra K. Dunn, Robert L. Klarquist, Albert M. Ferlo, Jr., Edward J. Shawaker and Russell J. Mays for Claimant and Respondent.
Laurens H. Silver and Betsy Dodd for Intervener and Respondent.
Gibson, Dunn & Crutcher, A. Randall Farnsworth, Charles J. Meyers and Michael E. Miner as Amici Curiae on behalf of Claimant and Respondent and Intervener and Respondent.
*454 OPINION
KAUFMAN, J.
In this case we must decide whether the United States has California riparian water rights on federal land reserved for national forest purposes, and, if so, whether such rights are inherently "defeasible," or subordinate to all other approved water uses. As to the first issue, we conclude that the federal government does have such riparian rights; as to the second, that those rights are no more defeasible than the riparian rights of other California landowners. The facts and the law underlying this controversy are set forth below.

FACTUAL AND PROCEDURAL BACKGROUND
In August 1976, a private water rights claimant petitioned the State Water Resources Control Board (Board) for a determination of the rights of various claimants to the use of the waters of Hallett Creek Stream System in Lassen County.[1] After a preliminary investigation, the Board determined the public interest would be served by such a determination and granted the petition. (Wat. Code, § 2525.) Thereafter, various parties submitted proofs of claims to the water of Hallett Creek, including the United States acting on behalf of the United States Forest Service, a branch of the United States Department of Agriculture. (Wat. Code, §§ 2526, 2528.)
(1) (See fn. 2.), (2) (See fn. 3.) The United States claimed water for use in the Plumas National Forest. The rights claimed were of two kinds: (1) a "reserved" water right under federal law for "primary" national forest purposes, defined as firefighting and roadwatering, and (2) riparian[2] water *455 rights under California law for "secondary" national forest purposes, described by the United States as "wildlife enhancement."[3]
After an evidentiary hearing, the Board issued its findings and determination, declaring and quantifying the rights of the various claimants. The Board upheld the United States reserved-rights claim, authorizing the Forest Service to divert and use up to 95,000 gallons of water annually for firefighting and roadwatering during timber harvesting.[4] The Board rejected, however, the United States request for recognition of unexercised riparian water rights for future wildlife-enhancement use. The Board concluded that under California law the federal government was not entitled to riparian rights, and ruled that in any event Congress had voluntarily "severed" or relinquished all proprietary claims to water within the national forest through the enactment of a series of nineteenth-century public land laws.
The Board filed its order of determination with the Lassen County Superior Court. (Wat. Code, § 2750.) The United States filed a notice of exceptions to the order of determination (Wat. Code, § 2757), objecting to the findings and order "to the extent that they [did] not allow the claim of the United States for an unexercised riparian water right...." The Sierra Club successfully moved to intervene on behalf of the United States. (3) (See fn. 5.) After further briefing and a hearing, the superior court sustained the exceptions of the United States and the Sierra Club, ruling that the United States was entitled to the same riparian rights under California law as any other property owner, and, further, that federal *456 legislation which had subordinated federal riparian rights to appropriative rights in the "public domain" did not apply to "reserved" lands in the Plumas National Forest.[5] The trial court's decree thus recognized that the United States had an unexercised riparian right to the use of the waters of Hallett Creek, but held that the United States must apply to the Board or to the court when and if it sought to exercise that right. The Board appealed.
The Court of Appeal affirmed the trial court's decree insofar as it recognized the United States claim to unexercised riparian rights under California law, but held that pursuant to federal legislation such rights were absolutely "defeasible," i.e. automatically subordinate to the rights of subsequent appropriators. All three parties  the United States, the Board and the Sierra Club  filed petitions for review.
The United States and the Sierra Club challenge the Court of Appeal's holding that United States riparian rights are automatically subordinate to the claims of subsequent appropriators. The Board assails the Court of Appeal's conclusion that California law recognizes any riparian rights, defeasible or otherwise, in federal lands. We granted all three petitions and subsequently permitted the Association of California Water Agencies, the Turlock and Modesto Irrigation Districts, and the Friant Water Users Authority to file amicus curiae briefs.[6]
We shall affirm that portion of the Court of Appeal judgment which recognizes riparian rights on federal reserved lands, but reverse that portion of the judgment which would subordinate such rights to all other approved uses.

*457 INTRODUCTION
The issues presented are both novel and potentially significant. The United States has not heretofore claimed riparian rights in connection with its reserved lands in California. The Board asserts that recognition of such a claim could have far-reaching consequences, since the federal government owns a sizable percentage of the land in California.[7]
The Board and the United States[8] vigorously dispute the meaning of water rights doctrines, congressional enactments, and federal and state judicial decisions which date from as early as the mid-nineteenth century. A brief introduction to the subject, therefore, may be useful.
As noted earlier, the United States claims water in the Hallett Creek System on two separate grounds  "reserved" water rights under federal law, and "riparian" rights under California law. (4) The reserved water rights doctrine provides that when the United States reserves land from the public domain for federal purposes, it implicitly reserves sufficient water to accomplish the purposes of the reservation. (See Cappaert v. United States, supra, 426 U.S. at pp. 138-142 [48 L.Ed.2d at pp. 534-536]; United States v. New Mexico, supra, 438 U.S. at p. 698 [57 L.Ed.2d at p. 1056].) The United States thereby acquires a "reserved" water right (subject to whatever rights may have vested while the lands were in the public domain) which vests on the date of the reservation and is superior to the rights of future appropriators. (Cappaert v. United States, supra, 426 U.S. at p. 138 [48 L.Ed.2d at p. 534].) The reservation doctrine thus constitutes an exception to the plenary authority which the states otherwise enjoy over the nonnavigable waters within their borders. (California v. United States, supra, 438 U.S. at p. 662 [57 L.Ed.2d at p. 1030].)
In the seminal case of United States v. New Mexico, supra, 438 U.S. 696, the United States Supreme Court construed the reservation doctrine narrowly, holding that a reservation of federal lands impliedly reserved only so much water as was necessary to accomplish the "primary" or "specific" *458 purposes of the reservation. (Id. at pp. 705-718 [57 L.Ed.2d at pp. 1059-1067].) In New Mexico, as here, the United States sought to acquire water for wildlife enhancement of certain reserved lands  the Gila National Forest in New Mexico. The Supreme Court held, however, that wildlife preservation constituted a "secondary" purpose of the national forests, the primary purposes being limited to timber and water preservation. (438 U.S. at pp. 696, 711-715 [57 L.Ed.2d at pp. 1063-1066].) Therefore, the court held, water for wildlife preservation purposes was not available under the reserved rights doctrine. (Id. at pp. 711-713 [57 L.Ed.2d at pp. 1063-1065].)
In so holding, however, the high court noted that the United States was free to seek water for wildlife preservation under state law. (5) "Where Congress has expressly addressed the question of whether federal entities must abide by state water law, it has almost invariably deferred to the state law. [Citation.] Where water is necessary to fulfill the very purposes for which a reservation was created, it is reasonable to conclude, even in the face of Congress' express deference to state water law in other areas, that the United States intended to reserve the necessary water. Where water is only valuable for a secondary use of the reservation, however, there arises the contrary inference that Congress intended, consistent with its other views, that the United States would acquire water in the same manner as any other public or private appropriator." (438 U.S. at p. 702 [57 L.Ed.2d at p. 1058], italics added.)
The only available method of acquiring water under New Mexico law was appropriation. (6a) California, however, is one of the few states which recognizes both appropriative and riparian rights. (National Audubon Society v. Superior Court, supra, 33 Cal.3d at pp. 441-443; see generally, Hutchins, supra, at pp. 40-54.) Accordingly, the United States has claimed a riparian right to the use of the waters of Hallett Creek for wildlife enhancement purposes. The United States asserts that it has the same riparian water rights under California law as any other "ordinary proprietor."
The Board vigorously opposes any recognition of riparian rights on federal reserved lands. Its argument is essentially twofold: First, the Board contends that the federal government may not exercise riparian rights under California law because the United States is said to hold land as a "sovereign," not as an "owner"; its water rights, therefore, allegedly derive from, and are limited to, those delegated under the federal Constitution. Second, conceding arguendo that the federal Constitution does not bar the exercise by the United States of riparian water rights under California law, the Board contends that Congress, through the adoption of a series of mining and homestead laws during the mid-nineteenth century, voluntarily relinquished all proprietary claims to the western waters, except for reserved *459 water rights. Each of these points is addressed in the discussion which follows.

DISCUSSION

A. Federal Proprietary Rights

(7a) The Board initially contends the United States does not "own" federal land in the sense that would allow it to claim riparian rights as an ordinary proprietor under state law. The United States, it is argued, holds land in its sovereign capacity; its sovereign authority derives exclusively from, and is limited to, the powers delegated by the federal Constitution; therefore, the federal government may not exercise proprietary rights that arise under state law. The argument is unmeritorious.
Private and government ownership of land obviously differ in certain fundamental respects. (8) Unlike private property, government land usually cannot be condemned or seized, or obtained by adverse possession. A private owner holds property under local law; the government holds and controls land by virtue "of its own fiat" and may change the rules of ownership at will. (See Trelease, Government Ownership and Trusteeship of Water (1952) 45 Cal.L.Rev. 638, 649-653.) In this respect, to speak of government "ownership" is really to describe a variety of governmental powers over the regulation and control of the property it holds. Not surprisingly, therefore, a close reading of United States Supreme Court decisions involving water rights disputes between the states and the federal government reveals that the court has consistently premised its holdings on the sovereign rights, rather than the proprietary interests, of the United States. For example, the Supreme Court has recognized that under the federal Constitution's commerce clause (U.S. Const., art. I, § 8, cl. 3) the United States has superior power to protect the navigability of a river from state action (the so-called "navigation servitude"; see United States v. Rio Grande Dam & Irrig. Co. (1899) 174 U.S. 690, 703 [43 L.Ed. 1136, 1141, 19 S.Ct. 770]), and under the property (U.S. Const., art. IV, § 3, cl. 2)[9] and supremacy (U.S. Const., art. VI, cl. 2) clauses the Supreme Court has held the states may not deprive the federal government of water sufficient to accomplish the primary purposes of a federal reservation (the "reserved rights" doctrine discussed earlier; see United States v. New Mexico, supra, 438 U.S. at p. 698 [57 L.Ed.2d at p. 1055]; Arizona v. California, supra, 373 U.S. at pp. 597-598 *460 [10 L.Ed.2d at p. 576]; Cappaert v. United States, supra, 426 U.S. at pp. 138-142 [48 L.Ed.2d at pp. 533-536]).
Nevertheless, it has never been established that the federal government may not, in addition to its sovereign prerogatives, exercise the common law rights of an ordinary proprietor under state law. (9) To the contrary, the United States Supreme Court has long recognized that "the [federal] government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers. It may deal with such land precisely as a private individual may deal with his farming property." (Camfield v. United States (1897) 167 U.S. 518, 524 [42 L.Ed. 260, 262, 17 S.Ct. 864].) In Kleppe v. New Mexico (1976) 426 U.S. 529, 540 [49 L.Ed.2d 34, 44, 96 S.Ct. 2285], the court reaffirmed this principle, holding that "the Property Clause gives Congress the power over the public lands `to control their occupancy and use, to protect them from trespass and injury and to prescribe the conditions upon which others may obtain rights in them....' [Citation.]" Under the powers granted by the United States Constitution, the court stated, "Congress exercises the powers both of a proprietor and of a legislature over the public domain." (Ibid., italics added.)
(7b) In recent decisions, moreover, the high court has reaffirmed the long-established principle that Congress not only may defer, but nearly always has deferred, to state law in determining rights to water on federal lands. (See California v. United States, supra, 438 U.S. at pp. 653-670 [57 L.Ed.2d at pp. 1024-1035]; United States v. New Mexico, supra, 438 U.S. at pp. 701-702 [57 L.Ed.2d at p. 1058].) As the court observed in New Mexico: "Where Congress has expressly addressed the question of whether federal entities must abide by state water law, it has almost invariably deferred to the state law." (438 U.S. at p. 702 [57 L.Ed.2d at p. 1058].)
The New Mexico decision is particularly instructive for our purposes here. In that case, as noted earlier, the United States claimed rights to the water of the Rio Mimbres River in the State of New Mexico to maintain minimal instream-flows for fishing and recreation purposes in the Gila National Forest. That claim (unlike the United States claim made here) was based on federal law  the reserved rights doctrine  under which federal reserved lands are entitled to sufficient water to accomplish the purposes for which the lands were reserved. The Supreme Court ultimately rejected the claim, holding that the United States was entitled under federal law to only so much water as was required to accomplish the "specific" or "primary" purposes of the national forests, which did not include wildlife preservation. (438 U.S. at pp. 700, 706-709 [57 L.Ed.2d at pp. 1057, 1060-1062].)
*461 Such a narrow construction of the reserved rights doctrine was compelled, the court held, by a congressional policy  enunciated in dozens of federal statutes dating from the Mining Act of 1866  "of deferring to state law." (438 U.S. at p. 702, fn. 5 [57 L.Ed.2d at p. 1058].) For example, the court noted that the National Park Service Act of 1946 had specifically authorized appropriations for the "[i]nvestigation and establishment of water rights in accordance with local custom, laws and decisions of courts, ... for the use and protection of water rights necessary or beneficial in the administration and public use of the national parks and monuments." (Id. at pp. 702-703 [57 L.Ed.2d at p. 1058].) Moreover, "[t]he agencies responsible for administering the federal reservations have also recognized Congress' intent to acquire under State law any water not essential to the specific purposes of the reservation." (Id. at p. 702 [57 L.Ed.2d at p. 1058].) The Forest Service was no exception, the court noted, observing that the Forest Service Manual itself states: "The rights to use water for national forest purposes will be obtained in accordance with State law." (Id. at p. 703, fn. 7 [57 L.Ed.2d at p. 1059] italics added.)
Thus, as observed in New Mexico, "[w]here water is only valuable for a secondary use of the reservation ... there arises the ... inference that Congress intended, consistent with its other views, that the United States would acquire water in the same manner as any other public or private appropriator." (438 U.S. at p. 702 [57 L.Ed.2d at p. 1058], italics added.) Although the State of New Mexico recognized only appropriative rights, the underlying principle of deference to state law logically extends to any water right recognized under local law  including riparian rights. Indeed, in a case concerning federal water rights at Camp Pendleton, California, the Ninth Circuit Court of Appeals specifically held that under California law the United States had riparian rights in "acquired" lands, i.e., lands acquired by the federal government from a nonfederal owner by purchase, condemnation, gift or exchange. (See California v. United States (9th Cir.1956) 235 F.2d 647, 656.) The United States may similarly claim such rights in lands which it holds as the original owner.
There is no merit to the Board's contention that the United States Constitution precludes the federal government from acquiring riparian rights under California law.

B. Riparian Rights and the Severance Doctrine

We next consider the Board's contention that Congress affirmatively relinquished all proprietary claims to the waters of the West through the enactment of the Mining Acts of 1866 and 1870 and the Desert Land Act of *462 1877. The contention is rooted in events and laws which date from California's admission to the Union.
In 1850, California was admitted to the Union "on an equal footing with the original States in all respects whatever." (9 Stat. 452.) Although section 3 of the act of admission expressly reserved to the United States all "public lands" within California, no express provision was made with respect to the waters in California's lakes, streams and rivers. (See California v. United States, supra, 438 U.S. at p. 654 [57 L.Ed.2d at p. 1025].) (10) Under the so-called "equal footing" doctrine, however, the United States Supreme Court recognized that new states were entitled to plenary control of the water within their territory on an equal footing with the original thirteen states. (See Kansas v. Colorado (1907) 206 U.S. 46, 92-95 [51 L.Ed. 956, 972-974, 27 S.Ct. 655]; United States v. Rio Grande Dam & Irrig. Co., supra, 174 U.S. at pp. 702-703, 709 [43 L.Ed. at pp. 1141, 1143-1144].)[10]
Almost simultaneously with California's admission to the Union, there occurred an event of nearly equal significance  the discovery of gold. As miners and settlers streamed into California, they took what water they needed to work their mines and farms by diverting it from the natural watercourses. From this process arose the local priority rule of "first in time, first in right," or prior appropriation. (See People v. Shirakow, supra, 26 Cal.3d at pp. 306-307.) The doctrine of prior appropriation sharply differed from the common law system of riparianism which had obtained in the East and which automatically entitled the owner of land bordering a watercourse to rights in the water.
As settlement of the West proceeded apace, two related and troubling issues remained unresolved: the rights of riparian owners versus appropriators, and the interests of the federal government in relation to private claimants. Although this court had approved and applied the doctrine of prior appropriation between private claimants at an early date (see Irwin v. Phillips (1855) 5 Cal. 140), our early decisions also recognized the potentially superior title of the federal government (see, e.g., Kidd v. Laird (1863) 15 Cal. 161, 181; Boggs v. Merced Mining Co. (1859) 14 Cal. 279, 374-375). With the enactment of the Homestead Act of 1862, which established formal procedures for the acquisition of federal lands, fears intensified that the *463 rights of prior appropriators could be defeated by the superior riparian rights of the federal government, or of federal patentees. (See Note, Federal-State Conflicts Over the Control of Western Waters (1960) 60 Colum. L.Rev. 967, 971.)
The Mining Act of 1866 (14 Stat. 253, ch. 262; 43 U.S.C. § 661) was intended to alleviate these concerns by authorizing miners to explore and occupy the public lands, and by expressly recognizing those rights to the use of water on public lands that had previously been recognized by state law.[11] An amendment in 1870 provided expressly that all patents issued thereafter would be subject to the water rights recognized by the Mining Act of 1866 (16 Stat. 218, ch. 235; 43 U.S.C. § 661.)[12] Together, these acts represented federal confirmation of the validity of water appropriations which were recognized under state and local law.
Moving from the protection of miners' claims to the problem of settlement and reclamation of the arid lands of the West, Congress passed the Desert Land Act of 1877 (19 Stat. 377, ch. 107; 43 U.S.C. §§ 321-323.)[13] That act provided for the sale of desert land to any settler intending to reclaim the land by irrigation, with the following important proviso: "... [p]rovided, however, that the right to the use of water by the person so conducting the same, on or to any tract of desert land... shall depend upon bona fide appropriation; and such right shall not exceed the amount of water actually appropriated, and necessarily used for the purpose of irrigation and reclamation; and all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining, and manufacturing purposes, subject to existing rights." (43 U.S.C. § 321 (1976).)
On its face, the Desert Land Act simply made the appropriation doctrine generally applicable to the waters of the West, limited the settlers' water *464 rights to that which they had actually appropriated and used, and declared all surplus water to be free for appropriation by the public. (See Trelease, Federal-State Relations In Water Law (1971) at p. 147d.) The act would subsequently be accorded much greater significance by the state and federal courts, however, initially in the context of disputes between riparians and appropriators, later in cases involving the states and the federal government. In resolving these disputes, the various courts relied on differing theories as to the nature of the federal government's original proprietary interest in the waters of the West and the origin of state control over these waters. Although well over a century old, these debates provide live legal ammunition to both sides of the current dispute over the waters of Hallett Creek.
The theoretical, though not the chronological, starting point of the controversy may be conveniently placed at Lux v. Haggin (1886) 69 Cal. 255 [10 P. 674], widely recognized as the landmark decision holding that California adopted the riparian system of water rights when it received the common law in 1850. California thus became a "dual" water rights state, recognizing both riparian and appropriative rights. (See Hutchins, supra, at pp. 52-55.) Lux involved a dispute between riparian owners and appropriators of the waters of the Kern River. In determining that both riparian and appropriative rights exist in California, the court reasoned that although the United States had retained title to the public lands and waters of the West, sovereignty had passed to the states as they were formed. Thus the states possessed the power to determine the rights that attached to federal lands. (69 Cal. at pp. 335-336.) Since California, by adopting the common law, had automatically recognized riparian rights, the court concluded that the federal government held riparian rights under state law as owner of the public lands, and that transfers to federal patentees carried with them riparian rights. "A grant of public land of the United States carries with it the common-law [riparian] rights to an innavigable stream thereon...." (Id. at p. 336.) (Italics omitted) Of course, the Lux court recognized that such federal conveyances were subject to any reserved federal rights, as well as any private appropriations of water which the United States had "licensed" (id. at pp. 338-339) or, as a later court put it, "consented" to pursuant to the Acts of 1866, 1870 and 1877. (Palmer v. Railroad Commission (1914) 167 Cal. 163, 168-169 [138 P. 997].)
This concept of the nature of state sovereignty and of federal water rights became known as the California doctrine. (See Note, supra, 60 Colum. L.Rev. at pp. 972-973.) Countervailing theories of federal and state water rights developed in other western states, however, where California's dual model of coexisting riparian and appropriative rights was rejected in favor of a unitary system of prior appropriation. The Oregon courts, for example, *465 agreed with California that the federal government originally held riparian rights to the waters of the public domain and that these rights survived the formation of the western states. The Oregon courts, however, construed the Desert Land Act as having "severed" or effected a "reservation" of the federal government's water rights, so that a federal patent conveyed rights only to land and not to water. Under the so-called Oregon doctrine, moreover, the Desert Land Act was construed as having established a "uniform rule" of appropriative rights in the western states. (The seminal Oregon decision is Hough v. Porter (1909) 51 Ore. 382 [98 P. 1083, 1091-1092].)[14]
The state courts continued to weave their separate theoretical tapestries for several decades. California continued to adhere to the theory that a federal patent conveyed to the patentee the riparian rights of the United States, subject to the rights of prior appropriators. (See, e.g., Palmer v. Railroad Commission, supra, 167 Cal. at pp. 168-169 ["The United States, with respect to the lands which it owns in the state, is a riparian proprietor as to the streams running through such lands.... [A] grant of its lands by the United States to a private person ... would carry with it the riparian rights pertaining to that land ..."]; see also, Duckworth v. Watsonville Water etc. Co. (1915) 170 Cal. 425, 431-432 [150 P. 58]; Canal & Irrigation Co. v. Worsick (1922) 187 Cal. 674, 686, 690 [203 P. 999].) Indeed, in Worsick this court expressly rejected Oregon's view that the Desert Land Act had severed the United States riparian rights from the land itself. (187 Cal. at p. 690.)
Other California decisions, however, suggested that the federal government might not hold riparian rights under California law. (See, e.g., McKinley Bros. v. McCauley (1932) 215 Cal. 229, 231 [9 P.2d 298] ["[R]iparian rights do not attach to lands held by the government until such land has been transmitted to private ownership."]; accord, Rindge v. Crags Land Co. (1922) 56 Cal. App. 247, 252 [205 P. 36].)
Finally, in 1935, the United States Supreme Court resolved the doctrinal debate, holding that a federal patent of desert land did not automatically convey "federal" riparian rights. In California-Oregon Power Co. v. Beaver Portland Cement Co. (1935) 295 U.S. 142 [79 L.Ed. 1356, 55 S.Ct. 725], a landowner whose title derived from a federal homestead patent issued in *466 1885 claimed the patent carried with it the common law riparian rights of the federal government. The Supreme Court, in considering the issue, reviewed the now familiar history of water law in the West, beginning with the informal evolution of appropriative rights, through the adoption of various state law systems during the federal period of "silent acquiescence," and culminating finally with Congressional enactment of the Mining Acts of 1866 and 1870 and the Desert Land Act of 1877. (295 U.S. at pp. 154-158 [79 L.Ed. at pp. 1359-1361].) Focusing primarily on the Desert Land Act, particularly the clause declaring all surplus water to be "free for the appropriation and use of the public," the Supreme Court concluded: "If this language is to be given its natural meaning ... it effected a severance of all waters upon the public domain, not theretofore appropriated, from the land itself. From that premise, it follows that a patent issued thereafter for lands in a desert-land state or territory ... carried with it, of its own force, no common law right to the water flowing through or bordering upon the lands conveyed." (295 U.S. at p. 158 [79 L.Ed. at pp. 1361-1362], italics added.)
Thus, the United States Supreme Court essentially opted for the Oregon doctrine, concluding that the Desert Land Act had severed the waters of the public domain from the soil, so that a federal patent conveyed rights to land but not to water. Significantly, however, the high court rejected Oregon's view that the Desert Land Act had imposed a "uniform rule" of appropriation, holding instead that the act recognized each state's power "to determine for itself to what extent the rule of appropriation or the common-law rule in respect of riparian rights should obtain." (295 U.S. at p. 164 [79 L.Ed. at p. 1364].)
(7c) Based on the foregoing state and federal authorities, each party to the current dispute attempts to demonstrate conclusively that the federal government either has (the Board) or has not (the United States) expressly relinquished all claims to riparian rights under state law. The United States, embracing the California doctrine, argues as follows: This court's holding that a federal patent conveyed riparian rights to federal patentees (Lux v. Haggin, supra, 69 Cal. at p. 336) necessarily recognized the existence of riparian rights in federal lands. The Desert Land Act, with respect to the public domain lands where it applied, merely subordinated the common law riparian rights of the United States to the vested rights of prior appropriators already recognized under state law (Palmer v. Railroad Commission, supra, 167 Cal. at p. 168), but did not terminate the federal government's riparian rights altogether.
The Board, on the other hand, asserts a modernized version of the Oregon doctrine: The reason that a federal patent conveyed no water rights to the patentee (California-Oregon Power, supra, 295 U.S. at p. 158 [79 L.Ed. *467 at p. 1361]), the Board argues, is that Congress in enacting the Desert Land Act affirmatively "severed" or relinquished all proprietary claims to the western waters. Therefore, whatever riparian water rights in federal lands were recognized in Lux v. Haggin, supra, 69 Cal. 255, were effectively terminated by that act.
None of the cited decisions is dispositive of the issue before us. Each considered the question of federal water rights solely to evaluate the derivative claims of federal patentees; none addressed a water claim asserted by the federal government itself. The California-Oregon Power court, supra, 295 U.S. 142, in rejecting the view that a federal patent transferred riparian rights to the patentee and holding instead that Congress had "severed" the water from the land which it conveyed, did not state  or even suggest  that the United States had thereby "relinquished" all water rights in the land which it retained. Indeed, had that been Congress's intent, it is reasonable to assume that that is precisely what Congress would have said, and what the United States Supreme Court would have held.
Nothing in California-Oregon Power, supra, 295 U.S. 142, in the Desert Land Act, or in any of our early decisions construing that act, undermines the principle, uniformly recognized in Lux and its progeny, that riparian rights exist in federal lands located in California as surely as they inhere in private lands. (See Lux v. Haggin, supra, 69 Cal. at p. 335-336; Palmer v. Railroad Commission, supra, 167 Cal. at pp. 168-169.) We have never in California predicated the recognition of riparian water rights on the identity of the riparian owner, and we perceive no principled reason to do so now.
The Board's reliance on dictum in McKinley Bros. v. McCauley, supra, to the effect that "riparian rights do not attach to lands held by the government until such land has been transmitted to private ownership," does not establish otherwise. (215 Cal. at p. 231.) The dispute in that case was between a prior appropriator and a subsequent patentee of federal land, and the clear purpose of the quoted statement was to indicate that the patentee's priority did not accrue, or "attach," against prior appropriators until the patent issued.
(6b) Accordingly, we conclude that under California law riparian water rights exist on federal lands located within the State of California.

C. Defeasibility of Riparian Rights Held by the United States in Reserved Lands

(11) Although the Desert Land Act did not terminate the interests of the federal government in the waters of the public domain, it did subordinate *468 those interests to the rights of subsequent appropriators recognized under state and local law. The Desert Land Act unequivocally provides that "all surplus water over and above ... actual appropriation and use, together with the water of all lakes, rivers, and other sources of water supply upon the public lands and not navigable, shall remain and be held free for the appropriation and use of the public for irrigation, mining, and manufacturing purposes subject to existing rights." (Italics supplied.) As the United States concedes, this language automatically subordinates the riparian rights of the federal government in the public domain lands covered by the act to the rights of appropriators established under state law.
The Court of Appeal, however, held that the Desert Land Act applied to federal reserved lands as well. Thus, while recognizing the existence of federal riparian rights in the Plumas National Forest, the Court of Appeal ruled that such rights must be regarded as "secondary to all other approved uses." The Court of Appeal coined a new term to describe the United States riparian interest  a "defeasible riparian water right." This holding was erroneous.
The Desert Land Act of 1877 and the Supreme Court's decision in California-Oregon Power spoke of "public lands." (43 U.S.C. §§ 321-323; 295 U.S. at p. 158 [79 L.Ed. at p. 1361].) As earlier noted, the term "public lands" (or "public domain") refers to lands owned by the federal government which have remained open to settlement, public sale or other disposition, and/or are now administered by the Department of the Interior through the Bureau of Land Management. (See Federal Power Comm'n v. Oregon, supra, 349 U.S. 435, 443-444 [99 L.Ed. 1215, 1223-1224]; Taylor Grazing Act, June 28, 1934, 48 Stat. 1269, as amended, 43 U.S.C. § 315 et seq.; Federal Land Policy and Management Act, 90 Stat. 2734, 43 U.S.C. § 1701 et seq.) Public domain lands are to be distinguished from "reserved lands," which are lands that have been reserved from the public domain for some predetermined purpose. (Cappaert v. United States, supra, 426 U.S. at p. 138 [48 L.Ed. at p. 534].)
(12) In Federal Power Comm'n v. Oregon, supra, 349 U.S. 435 (hereafter the Pelton Dam case) the United States Supreme Court held that the Desert Land Act and its predecessors, the Mining Acts of 1866 and 1870, did not apply to federal lands which have been reserved from the public domain. "The purpose of the Acts of 1866 and 1870 was governmental recognition and sanction of possessory rights on public lands asserted under local laws and customs. [Citation.] The Desert Land Act severed, for purposes of private acquisition, soil and water rights on public lands.... [¶] [T]hese acts are not applicable to the reserved lands and waters here involved.... The lands before us in this case are not `public lands' but *469 `reservations.' Even without that express restriction of the Desert Land Act to sources of water supply on public lands, these Acts would not apply to reserved lands." (349 U.S. at pp. 447-448 [99 L.Ed. at p. 1226]; original italics.)
Pelton Dam was reaffirmed in Cappaert v. United States, supra, 426 U.S. 128. In that case, a private claimant asserted rights under state law to water that the federal government claimed it had reserved in connection with a national monument (Devil's Hole). The private claimants argued that the Desert Land Act had severed the nonnavigable waters from the federal lands so that Nevada's appropriation doctrine applied. (426 U.S. at p. 143 [48 L.Ed.2d at p. 537].) The Supreme Court, citing Pelton Dam, flatly rejected the contention, stating: "[T]he Desert Land Act does not apply to water rights on federally reserved land." (Id. at p. 144 [48 L.Ed.2d at pp. 537-538].)
Pelton Dam, supra, 349 U.S. 435, and Cappaert, supra, 426 U.S. 128, make clear that the Desert Land Act does not apply to reserved lands.[15] Thus, the act's provisions subordinating water rights in public domain lands to the vested rights of appropriators established under state law have no effect on riparian rights in federally held reserved lands.
The Court of Appeal, however, apparently believed that Pelton Dam and Cappaert had been overruled in United States v. New Mexico, supra, 438 U.S. 696. Not so. In New Mexico, the Supreme Court held that Congress had intended to reserve only so much water as was necessary to accomplish the primary purposes of the national forests, and the excess was to remain free for acquisition under state law. (Id. at p. 702 [57 L.Ed.2d at p. 1058].) The court relied in part on the Organic Administration Act of June 4, 1897 (30 Stat. 34, 16 U.S.C. § 473 et seq. (1976)), which carefully defined the purposes for which national forests could be reserved, and further provided: "All waters within the boundaries of national forests may be used for domestic, mining, milling, or irrigation purposes, under the laws of the State wherein such national forests are situated...." (Id. at p. 717, fn. 24 [57 L.Ed.2d at p. 1067].)
(6c) From the high court's holding that any water in excess of that reserved by the United States must be free for appropriation under state *470 law, the Court of Appeal apparently inferred that any rights held or acquired by the United States must be regarded as secondary to all subsequent appropriations by the public. To the contrary, however, the court in New Mexico expressly stated that Congress had contemplated "the United States would acquire [unreserved] water in the same manner as any other public or private appropriator." (438 U.S. at p. 702 [57 L.Ed.2d at p. 1058], italics added.) Indeed, as the United States points out, Congress has expressly authorized the Forest Service to expend such funds "as may be necessary for the investigation and establishment of water rights ... necessary or beneficial in connection with the administration and public use of the national forests." (16 U.S.C. § 526, italics added.) Furthermore, although New Mexico, supra, 438 U.S. 696, spoke only in terms of "appropriation" (the exclusive water doctrine in the state of New Mexico), nothing in that decision limits the United States to the acquisition of appropriative rights where riparian rights are otherwise recognized under state law.
Moreover, there is no suggestion in New Mexico or in the Organic Administration Act of 1897 that Congress intended water rights, once acquired by the United States for secondary reservation purposes, to be subject to defeasance by subsequent claimants. We will not "impute to Congress a purpose to paralyze with one hand what it sought to promote with the other" (Clark v. Uebersee Finanz-Korp. (1947) 332 U.S. 480, 489 [92 L.Ed. 88, 94, 68 S.Ct. 174]; accord, American Textile Mfrs. Inst. v. Donovan (1981) 452 U.S. 490, 513 [69 L.Ed.2d 185, 204, 101 S.Ct. 2478]).
Nor does the concept of a federally held "defeasible riparian right" find any support in the law of California. As the Board readily concedes, the concept of a "defeasible" riparian right is without precedent in California. Though the unexercised riparian rights of any owner  governmental or otherwise  may be limited under California law, they cannot be altogether abolished. (See In re Waters of Long Valley Creek Stream System (1979) 25 Cal.3d 339, 357-359 [158 Cal. Rptr. 350, 599 P.2d 656].)
We therefore conclude that the riparian water rights of the United States on its reserved national forest lands in California are as fully immune from defeasance as the riparian rights of a private owner.

D. Limitations on the Riparian Right

Finally, the Board and the amici curiae water districts contend that recognition of unexercised riparian rights in federal reserved lands will disrupt the settled rights of appropriators throughout the state and impair the Board's ability to plan and manage the allocation of the state's scarce water supply. These concerns are unfounded. As we stated in In re Waters *471 of Long Valley Creek Stream System: (13) "[T]he [State Water Resources Control] Board is authorized to decide that an unexercised riparian claim loses its priority with respect to all rights currently being exercised. Moreover, to the extent that an unexercised riparian right may also create uncertainty with respect to permits of appropriation that the Board may grant after the statutory adjudication procedure is final, and may thereby continue to conflict with the public interest in reasonable and beneficial use of state waters, the Board may also determine that the future riparian right shall have a lower priority than any uses of water it authorizes before the riparian in fact attempts to exercise his right. In other words, while we interpret the Water Code as not authorizing the Board to extinguish altogether a future riparian right, the Board may make determinations as to the scope, nature and priority of the right that it deems reasonably necessary to the promotion of the state's interest in fostering the most reasonable and beneficial use of its scarce water resources." (25 Cal.3d at pp. 358-359; italics added.)
Thus the Board is fully empowered to make such "determinations as to the scope, nature and priority" of the unexercised federally-held riparian rights recognized herein, as the Board deems "reasonably necessary to the promotion of the state's interest in fostering the most reasonable and beneficial use" of its water resources. (In re Waters of Long Valley Creek, supra, 25 Cal.3d at p. 359.) Although, as the Board points out, the federal government's riparian rights may have theoretically "attached" when the land was reserved from the public domain, the Board may nevertheless order such rights subordinated to appropriative "rights currently being exercised," and may further "determine that the future riparian right [of the federal government] shall have a lower priority than any uses of water it authorizes before the riparian in fact attempts to exercise his right." (25 Cal.3d at p. 359.)
The trial court's decree recognized these principles in holding that United States had an unexercised riparian right to the use of waters in the Hallett Creek Stream System which may be subordinated to other uses. The trial court's decree specifically provided that holders of unexercised riparian rights in the Hallett Creek System, such as the United States, must apply to the Board or to the court for authority to exercise such rights, that such a determination shall be the subject of a supplemental decree, and that such riparian rights "shall possess a priority as of the date of application to the Board or the court, as the case may be." The decree further provided that unexercised riparian rights shall be subject "to all rights defined in this decree, including any supplemental decree, as the said decree exists on the date of the application ... by a riparian claimant," and shall likewise be subject to "any appropriative right initiated by application ... prior to the *472 date of application ... by a riparian claimant." The United States did not contest this ruling, and expressly conceded in both its briefs and at oral argument that its riparian right was unexercised and subject to subordination.
(6d), (14) (See fn. 16.) Thus, pursuant to the trial court's decree, the United States must apply to the Board whenever it proposes to exercise its riparian right, so that the Board may evaluate the proposed use in the context of other uses and determine whether the riparian use should be permitted in light of the state's interest in promoting the most efficient and beneficial use of the state's waters.[16] This provision of the trial court's decree was fully consistent with the principles set forth in In re Waters of Long Valley Creek System, supra, 25 Cal.3d 339.

DISPOSITION
The judgment of the Court of Appeal is affirmed insofar as it affirmed the trial court's decree and recognized that the United States has an unexercised riparian right to use the waters of the Hallett Creek Stream System. Otherwise, the Court of Appeal's judgment is reversed with directions to require the Board and the trial court to apply the principles set forth in this *473 opinion when and if the United States applies for the exercise of its riparian right.
Each party shall bear its own costs in this proceeding.
Lucas, C.J., Mosk, J., Broussard, J., Panelli, J., Arguelles, J., and Eagleson, J., concurred.
Appellants' petition for a rehearing was denied March 16, 1988.
NOTES
[1] Under provisions for a statutory adjudication of water rights (Wat. Code, § 2500 et seq.), the Board may determine "all rights to water of a stream system whether based upon appropriation, riparian right, or other basis of right" (Wat. Code, § 2501). The proceeding is initiated by a petition of one or more claimants to the stream system's water. If the Board finds that the public interest and necessity will be served by such a determination, it enters an order granting the petition. (Wat. Code, § 2525.) There ensues an investigation, notice, filing of proof of claims, and a hearing for contests of proof of claims. (Wat. Code, §§ 2550, 2575, 2600, 2650.) Following the hearing, the Board enters an "order determining and establishing the several rights to the water of the stream system." (Wat. Code, § 2700.) A certified copy of the order is "filed with the clerk of the superior court of the county in which the stream system or some part thereof is situated." (Wat. Code, § 2750.) The superior court then holds a hearing (Wat. Code, § 2751) and enters "a decree determining the rights of all persons in the proceeding." (Wat. Code, § 2768.) It was from such a decree that the Board took its appeal in this case.
[2] California law recognizes two primary water rights doctrines: riparian rights and appropriative rights. A riparian right accords to the owner of land bordering a watercourse the right to make reasonable and beneficial uses of the water on that land. Under the prior appropriation doctrine, a person who diverts or appropriates water from a watercourse and puts it to a reasonable and beneficial use acquires a right to that use which is superior to the rights of later appropriators. (See National Audubon Society v. Superior Court (1983) 33 Cal.3d 419, 441-443 [189 Cal. Rptr. 346, 658 P.2d 709]; People v. Shirakow (1980) 26 Cal.3d 301, 307-308 [162 Cal. Rptr. 30, 605 P.2d 859]; see generally, Hutchins, The Cal. Law of Water Rights (1956) pp. 40-41 (hereafter Hutchins).)
[3] Under the federal "reserved rights" doctrine, as explained hereinafter, when the United States "reserves" land from the public domain for purposes such as a national forest, it implicitly reserves the use of water sufficient to accomplish the "primary" purposes of the reservation, subject to whatever rights may have vested while the lands were in the public domain. (United States v. New Mexico (1978) 438 U.S. 696, 716 [57 L.Ed.2d 1052, 1066-1067, 98 S.Ct. 3012].) The reserved right is deemed to be created at the time of the reservation. (Cappaert v. United States (1976) 426 U.S. 128, 138 [48 L.Ed.2d 523, 534, 96 S.Ct. 2062]; Arizona v. California (1963) 373 U.S. 546, 600 [10 L.Ed.2d 542, 578, 83 S.Ct. 1468].) Since the federal government's reserved right is based on the property and supremacy clauses of the United States Constitution, the states may not deprive the federal government of the use of such water. (California v. United States (1978) 438 U.S. 645, 662 [57 L.Ed.2d 1018, 1030, 98 S.Ct. 2985]; United States v. New Mexico, supra, 438 U.S. at p. 698 [57 L.Ed.2d at p. 1055].) Water for "secondary" forestry purposes, such as wildlife enhancement, must be acquired under the law of the state where the reservation is situated. (United States v. New Mexico, supra, 438 U.S. at pp. 701-702 [57 L.Ed.2d at p. 1058].) As will be explained, the Board contends that the United States could obtain water for wildlife enhancement only as an appropriator under California law, whereas the United States contends it could be entitled to such water either as an appropriator or by virtue of a California riparian right.
[4] The United States reserved right was given a second priority, junior to M.A. Clement and J.C. Bailey, each of whom was awarded a first priority in the amount of 30 gallons per day.
[5] "Public domain" lands are lands open to settlement, sale, or disposition under the federal public land laws. Such lands are generally managed by the Department of the Interior, through the Bureau of Land Management. "Reserved" lands are lands which have been removed from the public domain for some predetermined purpose, such as a national park, national forest, Indian reservation, or military reservation. Such lands may be reserved by statute, executive order or treaty. (Federal Power Comm'n v. Oregon (1955) 349 U.S. 435, 443-444 [99 L.Ed. 1215, 1224, 75 S.Ct. 832].) The lands at issue here, the Plumas National Forest, were reserved by proclamation of President Theodore Roosevelt, dated July 14, 1905, and by proclamation of President William Howard Taft, dated July 28, 1910. (34 Stat. 3113 (1905); 36 Stat. 2731 (1910).)
[6] The amicus curiae briefs of the Association of California Water Agencies, a nonprofit corporation comprised of public water agencies, and the Friant Water Users Authority, a public agency comprised of 24 public districts which supply irrigation water received from the federal Central Valley Project, support the position taken by the Board in the current dispute. The amicus brief of the Turlock and Modesto Irrigation Districts curiously takes no position on the central issue, i.e., the existence of riparian rights in federal reserved lands held by the United States; it seeks, rather, recognition of riparian rights of federal licensees (both districts assert that they are licensees under the Federal Power Act, 16 U.S.C. § 791a et seq.), an issue which is not otherwise presented and on which we shall express no opinion.
[7] Figures cited by the Board and the United States indicate that the United States owns approximately 45 million acres out of the approximately 100 million acres in California, or 45 percent of the state's total land area. Of these 45 million acres, approximately 17 million acres remain as public lands administered by the Department of the Interior, Bureau of Land Management, 1.8 million acres are acquired lands, 20 million acres have been reserved as national forest lands, and 4 million acres have been reserved as national parks. (See United States Department of the Interior, Bureau of Land Management, Public Land Statistics 1984 (1985) at pp. 2, 10, 14, 22.)
[8] Because the arguments of the intervener Sierra Club and the United States are essentially the same in substance, we shall for convenience treat these contentions by reference nominally to the contentions of the United States only.
[9] Under the property clause, "The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States; and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular State." (U.S. Const., art. IV, § 3, cl. 2.)
[10] The states' plenary authority over the waters within their borders is subject, of course, to the "reserved" rights doctrine, under which the federal government impliedly reserves from state control sufficient water to accomplish the purposes of the federal reservation (United States v. New Mexico, supra, 438 U.S. at pp. 700-702 [57 L.Ed.2d at pp. 1056-1058]), as well as the so-called "navigation servitude," which protects the federal government's power under article I, section 8 of the federal Constitution to preserve the navigability of waterways (United States v. Rio Grande Dam & Irrig. Co., supra, 174 U.S. at p. 703 [43 L.Ed. at p. 1141]).
[11] The act provided in pertinent part: "Whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed; ...." (43 U.S.C. § 661 (1976).)
[12] The Patents Act of 1870 provides in pertinent part: "All patents granted, or preeemption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by [the preceding] section." (43 U.S.C. § 661 (1976).)
[13] The Desert Land Act applies to California, Colorado, Oregon, Nevada, Washington, Idaho, Montana, Utah, Wyoming, Arizona, New Mexico, North Dakota, and South Dakota. (43 U.S.C. § 323 (1976).)
[14] The Colorado courts developed a third variation on this theme. Under a theory similar to that urged by the Board herein, Colorado denied that the federal government had ever held proprietary rights in the western waters; therefore, no theories of federal "acquiescence" in private appropriations or "reservation" of riparian rights from federal patents were required to justify Colorado's exclusive recognition of appropriative rights. (See Sternberger v. Seaton Mountain E., L., H. & P. Co. (1909) 45 Colo. 401 [102 P. 168]; see generally, Note, supra, 60 Colum. L.Rev. at pp. 973-975.)
[15] The Board argues that if the Desert Land Act does not apply to federal reserved lands, it cannot be relied on for the application of state water law to such lands. The State of California's authority to regulate and control the water within its boundaries does not, however, rest on the Desert Land Act; that act merely recognized the state's preexisting authority over its waters under the "equal footing" doctrine. (See California v. United States, supra, 438 U.S. at pp. 653-656 [57 L.Ed.2d at pp. 1025-1027].)
[16] In this regard, the Board expresses concern that future claims to riparian water on federal reserved lands may escape the Board's broad oversight authority in those circumstances where a private claimant fails to request a determination of "all rights to water of a stream system." (Wat. Code, § 2501.) The Board's concerns are groundless. Contrary to the Board's suggestion, it is not powerless to assert the state's interest in the conservation and efficient use of water absent the assertion of a private claim. Section 275 of the Water Code provides that the Board "shall take all appropriate proceedings or actions before executive, legislative, or judicial agencies to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state." Pursuant to this authority, it has been held that the Board itself may bring a civil action to test the reasonableness of a riparian owner's use of water. (People ex rel. State Water Resources Control Bd. v. Forni (1976) 54 Cal. App.3d 743, 753 [126 Cal. Rptr. 851].) And in determining what is a "reasonable" use it is well settled that the court's inquiry, like the Board's, "cannot be resolved in vacuo isolated from statewide considerations of transcendent importance." (Joslin v. Marin Mun. Water Dist. (1967) 67 Cal.2d 132, 140 [60 Cal. Rptr. 377, 429 P.2d 889].) This court has also recognized the standing of public interest organizations to sue to enjoin unreasonable uses of water (Environmental Defense Fund, Inc. v. East Bay Mun. Utility Dist. (1980) 26 Cal.3d 183 [161 Cal. Rptr. 466, 605 P.2d 1]), and of any member of the general public to raise a claim of harm to the public trust. (National Audubon Society v. Superior Court, supra, 33 Cal.3d at p. 431, fn. 11; Marks v. Whitney (1971) 6 Cal.3d 251 [98 Cal. Rptr. 790, 491 P.2d 374].) Such claims may be brought in the courts or before the Board. (National Audubon Society v. Superior Court, supra, 33 Cal.3d at p. 449.) And in any lawsuit for a determination of rights to water, "the court may order a reference to the Board, as referee, of any or all issues" (Wat. Code, § 2000), or, alternatively, "may refer the suit to the board for investigation of and report upon any or all of the physical facts involved." (Wat. Code, § 2001.) Thus, it is clear that the Board's and the state's interest in the conservation and efficient use of water does not depend upon the fortuitous filing of claims by private parties, but may be asserted, and adequately protected, by initiative of the state itself or of concerned citizens.