[No. D008521. Fourth Dist., Div. One. Nov. 21, 1990.]

IMPERIAL IRRIGATION DISTRICT, Plaintiff and Appellant, v. STATE WATER RESOURCES CONTROL BOARD, Defendant and Respondent;
ENVIRONMENTAL DEFENSE FUND, INC., Intervener and Respondent.

COUNSEL

Horton, Knox, Carter & Foote, J. Penn Carter, Reginald L. Knox, Jr., Jennings, Engstrand & Henrikson, Paul D. Engstrand and Richard G. Opper for Plaintiff and Appellant.

John K. Van de Kamp, Attorney General, Andrea S. Ordin, Chief Assistant Attorney General, R. H. Connett, Assistant Attorney General and M. Anne Jennings, Deputy Attorney General, for Defendant and Respondent.

John W. Krautkraemer for Intervener and Respondent.

## OPINION

**FROEHLICH, J.**—This is an appeal from a judgment denying the petition for writ of mandate brought by Imperial Irrigation District (IID) to overturn a decision of the State Water Resources Control Board (Board).

### PROCEDURAL BACKGROUND AND STANDARDS FOR REVIEW

In 1980 a private citizen requested the Department of Water Resources to investigate alleged misuse of water by IID which had resulted in a rise in the level of the Salton Sea, flooding the citizen's farmland. After an investigation, an initial conclusion of water waste, and unproductive communications with IID, the Department of Water Resources referred the matter to the Board for investigation and action. The Board held a hearing which encompassed a period of six days late in 1983, taking testimony and receiving evidence from a number of sources including the original complaining citizen, the Department of Water Resources, IID, a number of other governmental agencies, and the intervener herein, the Environmental Defense Fund, Inc.

On June 21, 1984, the Board issued its decision regarding misuse of water by IID, herein designated Decision 1600 (hereafter sometimes referred to as Board Decision) which consisted of a 71-page review of the history of the proceedings, the evidence taken by the Board, the Board's findings and conclusions, and an order requiring certain action be taken by IID. The Board gave reconsideration to its decision upon the request of several parties, including IID. By order dated September 20, 1984, all modifications sought were denied and the previous decision was affirmed.

IID thereupon brought action in the superior court seeking review of the Board's action. By stipulation of the parties, the trial court bifurcated its review and undertook first to determine the question of the Board's jurisdiction. IID contended the Board did not have the power to render the adjudicatory decision contained in Decision 1600. (*Imperial Irrigation Dist.*

v. *State Water Resources Control Bd.* (1986) 186 Cal.App.3d 1160, 1162 [231 Cal.Rptr. 283]; hereafter cited as *Imperial I.*) The trial court agreed with IID, ruling that " '[t]he orders contained in Decision 1600 are without binding effect on [IID].' " (*Id.* at p. 1164.) An appeal to this court followed, resulting in reversal of the trial court's ruling, the court stating: "[W]e hold . . . that the Board's authority includes the power to adjudicate the article X, section 2, issue of unreasonable use of water by IID." (*Id.* at p. 1171.) The appellate court also ruled that a plenary review of the Board's decision should be by way of writ in the superior court. (*Ibid.*)

The case then being returned to the superior court, said court undertook to review by writ of mandate the substance of Decision 1600. Using the independent judgment test (as directed by this court, 186 Cal.App.3d at p. 1171), the court determined that the Board's findings were supported by the evidence, that its decision was "a reasonable and balanced directive for achieving compliance with Article X, Section 2," and that the writ should be denied. This appeal followed.

■ The appellate court's function, in reviewing determinations made by the superior court in its "independent judgment" review of an administrative agency decision, is to apply the substantial evidence test to factual findings. Factual determinations by the trial court will be upheld if substantial evidence, gleaned from the administrative record, supports them. (*Pasadena Unified Sch. Dist.* v. *Commission on Professional Competence* (1977) 20 Cal.3d 309, 314 [142 Cal.Rptr. 439, 572 P.2d 53]; 8 Witkin, Cal. Procedure (3d ed. 1985) Extraordinary Writs, § 254, p. 879.) The trial court's determinations of issues of law, however, are fully reviewable by this court, and we are bound neither by the preliminary resolution of same by the Board nor by the subsequent trial court decision. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 241, 242, pp. 246-249; *Shoban* v. *Board of Trustees* (1969) 276 Cal.App.2d 534, 541 [81 Cal.Rptr. 112].)

### POSTURE OF APPEAL

As IID concedes in its brief, the essential facts of this case are not in dispute. The experts on any particular issue were never in complete agreement, but their differences were of degree, not kind. For instance, estimates of water lost through "canal spill" ranged from 53,000 to 135,000 acre feet per annum; and water lost through excessive "tailwater" ranged from 312,000 to 559,000 acre feet per annum. There was no dispute, however, that very large quantities of water in each case were being lost. The dispute is whether such loss (and this is but one example of such decisions made by the Board) was or was not reasonable.

Such ultimate characterization of factual issues is, we apprehend, more a conclusion of law than an issue of fact. Since, as is conceded, there are no real factual issues, we are not required, at least as to the principal issues on appeal, to sift through the administrative record to search for "substantial facts" supporting the court's decision. To the extent ultimate conclusions are factual, such as the key determination made by the Board and the trial court that IID's use of water was "unreasonable," our identification of substantial evidence in support of the court's conclusion can rest upon undisputed facts before both tribunals and our independent analysis as to whether any reasonable court could come to the ultimate conclusion of fact reached by the Board and the court. (See 9 Witkin Cal. Procedure (3d ed. 1985) Appeal, §§ 296-298, pp. 307-311.)

IID's assertions principally attack the conclusions of law made by the Board, as the same were approved by the trial court. We are therefore required to consider whether the Board's determinations, contained in Decision 1600, are sustainable in terms of its jurisdiction, its interpretation of statutes and regulations, and its legal conclusions.

In this regard we note that the very same Decision 1600 was before this court previously, in *Imperial I, supra,* 186 Cal.App.3d 1160. Our court at that time, citing existing statutory and judicial precedent, ruled that the Board had full authority to exercise adjudicatory and regulatory functions in the field of water law (*id.* at p. 1165); that it had " 'broad authority to control and condition water use, insuring utilization consistent with public interest' " (*id.* at p. 1166); that in such adjudication the Board could consider the interests of concerned persons who might not be parties to court action (*id.* at p. 1167); that article X, section 2 of the Constitution requires that all uses of water conform to a standard of reasonable use, and that the Board has a duty to ensure this mandate (*id.* at p. 1168); that the Board's adjudicatory authority is "all-encompassing" (*id.* at p. 1169); and that the Board *shall* take all necessary action in executive, legislative and judicial forums to prevent waste and unreasonable water use. (*Ibid.*)

We also note that although the entire administrative record was before this court at the time of its prior hearing, and the court was obviously most conversant with the facts before, and decision of, the Board, it made no suggestion of any errors or transgressions by the Board in its interpretation and application of law. In light of this posture of the case it seems an uphill

climb, to say the least, for IID now to assert claims of lack of jurisdiction and erroneous construction of legal principles by the Board.

However, we concede that our prior decision was somewhat limited in scope, and that we did remit the case to the superior court for further consideration. We also recognize the acknowledged expertise of counsel now before the court in the subject of water law, and the historic and practical importance of the issues raised (or re-raised) by IID. We therefore address anew the legal contentions of IID. These contentions are several, and receive different characterization in the briefs of appellant and respondents. Our effort to summarize the contentions results in the following outline of issues:

1. Did the Board err in the definition and exercise of its jurisdiction? Specifically:

(a) Since the Legislature has never set standards for the reasonableness of use of irrigation water, but has left the same for the determination of local agencies, does the Board have the power to establish standards of reasonableness?

(b) Does the Board have power to interfere with vested water rights?

(c) Is the Board's action a violation of the separation of powers doctrine?

2. Assuming the Board acted within its jurisdiction, did it err in the exercise and application of its adjudicatory powers? Specifically:

(d) Did the Board apply the correct measure of deference to the determinations of IID, considering that IID acted in a legislative capacity and its determinations should be reversed only upon a finding of abuse of discretion?

(e) Assuming the Board can adjudicate controversies between disputant water users, does it have any right to investigate and regulate water use of a user when no controversy with any other user is evident, for the benefit of unidentified and undetermined future users who are not within the IID district?

(f)   Is the Board's conclusion that IID's water use is beneficial, and reasonable, consistent with its finding of water waste?

(g)   Is there anything in the specific order contained in Decision 1600 which exceeds reason or the bounds of the Board's discretion?

## THEORIES OF CASE RESOLUTION REJECTED

There are two major theories upon which our deliberations could be either peremptorily terminated or substantially foreshortened. Notwithstanding earnest invitations by each party, we decline to utilize either opportunity for sidestepping the issues just identified.

IID suggests that we should reconsider *Imperial I*, and that we reverse or refine principles therein stated. Although this court of course has the power to reconsider its prior decisions, and upon occasion has done so (see, e.g., *Canavin* v. *Pacific Southwest Airlines* (1983) 148 Cal.App.3d 512, 525-527 [196 Cal.Rptr. 82]), we decline the invitation in this case.

To the extent our statements in *Imperial I* were necessary to the decision in that case (i.e., not dictum) they have become the "law of the case" and are not now subject to modification. (See 9 Witkin, Cal. Procedure, Appeal, *op. cit. supra*, §§ 737, 738, pp. 705-708.) Insofar as statements in *Imperial I* may not be "law of the case," they nevertheless constitute persuasive authority which should be followed unless, by reason of passage of time or new enlightenment of some sort, they are found clearly erroneous. (*Id.* at § 773, p. 742.) Not only do we find *Imperial I* not erroneous, but our review convinces that "its rationale [is] quite persuasive." (*Swinerton & Walberg Co.* v. *City of Inglewood-L.A. County Civic Center Authority* (1974) 40 Cal.App.3d 98, 101 [114 Cal.Rptr. 834].) We therefore treat *Imperial I* as binding authority and follow it.

In a like vein, the Board suggests we should dismiss the appeal as moot. We are advised in both appellant's and respondent's briefs that since the adjudication herein, new action has been taken by IID which effectively responds to the orders contained in Decision 1600, and that this new action has been approved by new Board order WR 88-20. Taking judicial notice of WR 88-20, we find a recitation of action taken by IID which renders the facts summarized in Decision 1600 largely outdated, and an order mandating future action by IID which substantially supplants the order contained

in Decision 1600. We also note that an agreement has been negotiated between IID and the Metropolitan Water District which appears to satisfy many of the financial and other problems IID previously asserted as impediments to implementation of Decision 1600. Further, we are advised that the Board, by letter dated March 28, 1989, has found that "IID is in substantial compliance with the currently applicable directives in Board Order WR 88-20." In light of these developments, the Board asserts that no relief is needed by IID, and indeed that no order this court could now make would have any practical effect.

When events occur which render the granting of relief to a litigant impossible, the court should not proceed but should dismiss an appeal. Courts should decide actual controversies and "not . . . give opinions upon moot questions or abstract propositions, or . . . declare principles or rules of law which cannot affect the matter in issue in the case before it." (*Consol. etc. Corp.* v. *United A. etc. Workers* (1946) 27 Cal.2d. 859, 862-863 [167 P.2d 725].)

We agree with appellant, however, that the appeal from the determinations of Decision 1600 is not moot. Both in Decision 1600 and in order WR 80-20 IID was required to submit progress reports every six months until further Board notice; and in both orders the Board retained open-ended jurisdiction to review the adequacy of plans and progress of IID. These retained powers over future action of IID were based upon assertions of jurisdiction which are the subject of this appeal. Should IID prevail in its appeal we apprehend the result, although presumably not returning IID to its precise posture prior to Decision 1600, would materially affect its compliance action from this point forward. We therefore find the appeal not moot.

## DISCUSSION

1. *Jurisdiction*

(a) *Power to Establish Standards of Reasonableness*

Decision 1600 constitutes a comprehensive in-depth study of the water use practices of IID and its customers, and reaches the conclusion that certain practices of IID are wasteful of water and hence unreasonable and a misuse of water in violation of article X, section 2 of the California

Constitution[1] and section 100 of the California Water Code.[2] Relying on its own administrative regulations (Cal. Code Regs., tit. 23, § 4000 et seq.) the Board concluded it had the power to conduct hearings and to determine whether IID's water use was reasonable or wasteful.

IID challenges the Board's basic assertion of jurisdiction. IID admits that water use by Constitution and statute must be reasonable, but contends that insofar as use of water for irrigation purposes is concerned the Legislature either expressly or impliedly has left the decision as to what is reasonable to local agencies, such as IID, thus precluding the Board from entering this decision-making field. IID's argument is largely reliant on absence from statutes of any specific delegation of this power to the Board, and is bolstered by the citing of miscellaneous examples of the Legislature's handling of related issues.

Section 1004 (adopted in 1913 for purposes which seem irrelevant to today's circumstances), for example, provides that use of no more than two and one-half-acre feet of water per acre of "uncultivated areas of land not devoted to cultivated crops" is not a useful or beneficial purpose. Sections dealing with water from artesian wells, adopted in 1907, define in some detail what use is reasonable and what is wasteful. (§§ 301-303.) More recent legislation (§§ 1009, 375) dealing with water-saving and water-reclamation devices specifically is made inapplicable to agricultural uses. Sections 1011 et seq., adopted in 1979, referring to conservation of water and the sale of conserved water, do not provide any specific means for adjudication of reasonableness.

---

[1] Article X, section 2 provides: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such waters is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water. Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled. This section shall be self-executing, and the Legislature may also enact laws in the furtherance of the policy in this section contained."

Water Code section 100 contains language paralleling the constitutional provision, affirming that waste and unreasonable use of water are precluded.

[2] All statutory references are to the California Water Code unless otherwise specified.

Even the Agricultural Water Management Planning Act (adopted in 1986 and hence admittedly peripheral to our deliberations) provided that water management plans to achieve water conservation would be administered by the Department of Water Resources, not the Board. (See § 10800 et seq.)

IID also points to miscellaneous provisions which appear to vest in local agencies, such as IID, the power to determine which irrigation practices are "reasonable." Referring again to the Agricultural Water Management Planning Act, IID notes that under section 10840 et seq. the preparation of plans for water management is the responsibility of each water supplier, and that "[a]n agricultural water supplier shall implement its plan adopted pursuant to this chapter in accordance with the schedule set forth in its plan, as determined by the governing body of the agricultural water supplier." (§ 10843.)

Referring to a somewhat related program, IID finds in the Water Conservation and Reclamation Projects Act of 1985 (§ 11950 et seq.) a recognition of the need to conserve water on a statewide basis "for use in areas of the state with inadequate local supplies" (§ 11951 subd. (f)), but notes that even here emphasis is put upon local administration, section 11952 subd. (a) stating that the purpose is "to encourage local agencies and private enterprise to implement potential water conservation . . . ."

Finally, IID notes that in the 1982 legislation, relating to transfers of water between local agencies, an entire subchapter was devoted to "Deference to Decisions by Local or Regional Agencies," including a statement, in section 380 subdivision (c), that "[m]any water management decisions can best be made at a local or regional level" and, in section 381, that "[t]he authority of local or regional public agencies . . . shall control over any other provision of law which contains more stringent limitations on the authority of a particular public agency to serve water for use outside the agency . . . ."

All of this, we fear, is a scissors-and-paste job linking together bits of law which are either time specific or subject specific, in an attempt to fabricate a blanket rule to govern a state agency's jurisdiction. We really need look no further than our own precedent in *Imperial I* to reject the argument. ■ The history of the Board's jurisdiction is detailed at length therein. (*Imperial I, supra*, 186 Cal.App.3d at pp. 1165-1169.) We repeat in very summary form that:

(1) By statute (§ 174) the Board "shall exercise the adjudicatory and regulatory functions of the state in the field of water resources."

(2)  The Board " 'has been granted broad authority to control and condition water use . . . [extending] to regulation of water quality and prevention of waste.' " (Citing *Environmental Defense Fund, Inc.* v. *East Bay Mun. Utility Dist.* (1977) 20 Cal.3d 327, 341-342 [142 Cal.Rptr. 904, 572 P.2d 1128].)

(3)  The Board's duties and rights include ensuring compliance with the mandate of article X, section 2 of the Constitution, which requires that *"All* uses of water . . . must now conform to the standard of reasonable use." (Citing *National Audubon Society* v. *Superior Court* (1983) 33 Cal.3d 419, 443 [189 Cal.Rptr. 346, 658 P.2d 709].)

(4)  It was the intent of the Legislature to grant the Board broad, open-ended, expansive authority to undertake comprehensive planning and allocation of water resources. (Citing *In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 348-349 [158 Cal.Rptr. 350, 599 P.2d 656].)

We do not stop, however, with the citation of these broad principles, but attempt more specifically to focus on the question of power to determine the reasonableness of an irrigation use. At the outset, it is noted that authority relevant to governance of IID's activities is vested in both the Department of Water Resources and the Board. The responsibilities of these two agencies are somewhat overlapping and undoubtedly confusing to those not regularly conversant with California water law (see explanation contained in California Water Law in Perspective, 68 West's Ann. Water Code (1971 ed.) LXXXV-XCV). It is generally, however, the responsibility of the Department of Water Resources in the first instance to investigate waste or unreasonable use of water. (§ 225 et seq.) If the department is unsuccessful in reforming the misuse, the adjudication to determine misuse and the remedial measures taken to halt the same are the responsibility of the Board. (Cal. Code Regs., tit. 23, §§ 4004-4006.)

The procedures leading to Decision 1600 tracked this statutory path. An investigation by the Department of Water Resources, conducted in response to the citizen's complaint about flooding of lands near the Salton Sea, led to a report which concluded water waste. Failing to obtain what it deemed adequate cooperation from IID, the matter was then referred to the Board. Board hearings and conclusions followed in accordance with the statutory and regulatory pattern.

We start with the understanding, as per our numbered conclusions above, that the Board's obligations in the field of water use adjudication are broad, plenary and all-encompassing. We proceed by finding that the question of

IID's use or misuse of water was properly brought to the attention of the Board. With this background can one seriously contend that the decision as to whether a particular irrigation use is or is not reasonable is precluded the Board? We answer our own question by noting that IID very seriously takes this position. Respectfully, we must reject the contention. To say on the one hand that water conservation is the responsibility of the Board, and then to preclude it from measuring waste in irrigation practices, would be an absurd position.

We conclude the Board had jurisdiction to rule on the question whether irrigation practices of IID were reasonable or wasteful.

(b)  *Interference With Vested Rights*

Water used by IID and its customers is diverted from the Colorado River. Diversion instrumentalities, including dams, power plants and the All-American Canal, which brings water from the river to the Imperial Valley, were authorized by the Boulder Canyon Project Act, enacted December 21, 1928. (43 U.S.C. § 617 et seq.) The Boulder Canyon Project Act vested in the Secretary of the Interior the power to enter into contracts for the delivery and allocation of water to users in the southwestern United States. The several interested states were unable to come to an agreement as to water allocation, and their entitlements were finally resolved by the United States Supreme Court in 1963. (*Arizona* v. *California* (1963) 373 U.S. 546 [10 L.Ed.2d 542, 83 S.Ct. 1468].) Allocation of Colorado River water among users in Southern California was achieved through mutual agreement, however. The agreement, termed the "California Seven-Party Agreement," was executed on August 18, 1931, and remains in effect. Amount of entitlement and priority of distribution to IID are established in this agreement.

IID's water rights, therefore, are the result of federal statute, United States Supreme Court decision, and a seven-party agreement allocating water among Southern California users. Water rights within the state of California traditionally were derived from riparian rights or entitlement based upon prior appropriation. (See historical discussion in *United States* v. *State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 100-102 [227 Cal.Rptr. 161].) It is conceivable that IID's water rights, based as they are upon a unique blend of statutory and contractual origins, could be characterized as somehow more stable or securely vested than water rights from traditional sources. IID does not, however, make this claim. It simply contends that a right to use water, no matter how derived, once vested,

becomes a property right which cannot be undermined without due compensation.

Illustrative of IID's broad contention is the following quote from *United States v. State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at page 101: "It is . . . axiomatic that once rights to use water are acquired, they become vested property rights. As such, they cannot be infringed by others or taken by governmental action without due process and just compensation." The essence of IID's contention, therefore, is that the Board was without power to deprive IID of its discretionary power of determination of water use without providing compensation (which the Board admittedly has no power to provide).

As a preliminary matter we should note exactly what the Board did require of IID. The principal mandate contained in the Board Decision was an injunction that IID develop and present a water conservation plan. The trial court in its memorandum of decision noted that "except for requiring the District to repair defective tailwater structures, Decision 1600 itself requires no specific conservation measures, nor does it compel IID to sell, transfer, or otherwise convey water to the Metropolitan Water District or any other party. Decision 1600 simply requires the District to prepare plans to remedy its misuse of water, while retaining jurisdiction to review the adequacy of IID's plans."

We are unable, however, to agree that Decision 1600 did not substantially erode IID's otherwise virtually complete control over its water use. IID was required within a period of eight months to submit a plan for reservoir construction and to affirm its intent to construct one reservoir per year. Once a general plan of water conservation was achieved, IID was required to submit progress reports every six months "until the objectives have been achieved." The board reserved jurisdiction to monitor IID progress and to "take such other action" as might be required to assure compliance with an approved plan. There can be no doubt that the Board's intrusion into IID's previously untrammeled administration of the use of water in its district was substantial. As often stated in water law cases, "what is meant by a water right is the right to *use* the water . . . ." (182 Cal.App.3d at p. 100.) ▮ While the Board's decision in no way interfered with IID's contractual and statutory entitlement to Colorado River water, it most certainly presaged an interference with IID's utilization of that water once it traversed the All-American Canal.

Our conclusion that the Board Decision substantially impacted the practical use and administration by IID of its water does not, however, result in

our acceptance of IID's contention of unconstitutional interference with "vested" rights. Historic concepts of water "rights" in California were dramatically altered by the adoption in 1928 of the above referenced constitutional amendment. (182 Cal.App.3d at pp. 105-106.) Our Supreme Court, in *Gin S. Chow* v. *City of Santa Barbara* (1933) 217 Cal. 673 [22 P.2d 5], acknowledged that the new provision altered previously vested rights. "As already observed the amendment purports only to regulate the use and enjoyment of a property right for the public benefit, for which reason the vested right theory cannot stand in the way of the operation of the amendment as a police measure. A vested right cannot be asserted against it because of conditions once obtaining. [Citation.] It has been long established that all property is held subject to the reasonable exercise of the police power and that constitutional provisions declaring that property shall not be taken without due process of law have no application in such cases." (*Id*. at p. 703.)

The concept of the dimension of rights remaining to the water user after the constitutional amendment was fully developed in *Joslin* v. *Marin Mun. Water Dist.* (1967) 67 Cal.2d 132 [60 Cal.Rptr. 377, 429 P.2d 889]. In that case a lower user attempted to enjoin upstream diversion by a municipal water company upon the contention that the downstream prior use for deposit of sand and gravel was a vested, protectible use. The Supreme Court held that simply because a use is beneficial it does not become "reasonable" under the Constitution. Denying the plaintiff's assertion of compensability for its loss of water, the court focused on the *nature* of water rights after 1928. "While plaintiffs correctly argue that a property right cannot be taken or damaged without just compensation, they ignore the necessity of first establishing the legal existence of a compensable property interest. Such an interest consists in their right to the *reasonable* use of the flow of water . . . . [While a] vested right *as now defined* may not be destroyed or infringed upon without due process of law or without just compensation . . . [there is] no provision of law which authorizes an unreasonable use or endows such use with the quality of a legally protectible interest merely because it may be fortuitously beneficial to the lands involved." (*Id*. at pp. 143-144; see also *Peabody* v. *City of Vallejo* (1935) 2 Cal.2d 351 [40 P.2d 486]; *People* ex rel. *State Water Resources Control Bd.* v. *Forni* (1976) 54 Cal.App.3d 743 [126 Cal.Rptr. 851]; *National Audubon Society* v. *Superior Court* (1983) 33 Cal.3d 419, 443, fn. 23 [189 Cal.Rptr. 346, 658 P.2d 709] ["After the effective date of the 1928 amendment, no one can acquire a vested right to the unreasonable use of water."].)

Put simply, IID does not have the vested rights which it alleges. It has only vested rights to the "reasonable" use of water. It has no right to waste

or misuse water. The interference by the Board with IID's misuse (this finding of fact by the Board being accepted for purposes of the present issue) does not constitute a transgression on a vested right.

#### (c) *Violation of Separation of Powers Doctrine*

IID argues that its administration of its district's water use, including regulations governing tailwater management, canal spills, etc., is legislative in nature. Apparently presuming that the actions of the Board were adjudicatory and hence "judicial" in nature, IID claims a breach of the separation of powers doctrine.

"The separation of powers doctrine establishes that none of the coordinate branches of our tripartite government may exercise power vested in another branch. Article III, section 3, of the California Constitution provides: 'The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution.'" (*Estate of Cirone* (1987) 189 Cal.App.3d 1280, 1286 [234 Cal.Rptr. 749].)

IID contends that the decisions related to its administration of water use in its district are discretionary legislative decisions reserved by law to its board of directors. IID admits that the Board, as an ajudicatory body, has the power to resolve disputes in California relating to water rights. It contends, however, that the Board here has gone far beyond dispute resolution. In its Decision 1600 (as well as its subsequent order WR 88-20, which IID asks us to notice although it is subsequent to the decision giving rise to this appeal), the Board has gone well beyond the adjudication of any controversy. It has in fact, IID claims, engaged in the adoption of injunctive-type relief imposing upon IID the obligation of construction of capital improvements, adoption of new water use regulations, and probably the assessment of additional charges to its users.

The doctrine of "separation of powers" has been utilized in California to strike down interference by one of the primary branches of government with another. Its most typical application has been seen in the admonition that "a court may not compel the Legislature to enact a legislative measure . . . ." (*Mandel* v. *Myers* (1981) 29 Cal.3d 531, 539 [174 Cal.Rptr. 841, 629 P.2d 935].) The doctrine was thus the underpinning for determinations that the court could not compel the appropriation of funds by the state Legislature to pay unemployment insurance obligations owed the City of Sacramento (*City of Sacramento* v. *California State Legislature* (1986) 187 Cal.App.3d 393 [231 Cal.Rptr. 686]); and that the court was precluded

from overturning a legislative cap on appropriations for appointed counsel fees (*Estate of Cirone, supra,* 189 Cal.App.3d at p. 1280). In *Mandel v. Myers, supra,* 29 Cal.3d 531, the transgression upon the separation of powers was found to have been committed by the Legislature, when it redetermined the propriety of payment of a $25,000 fee which had been adjudicated owing in judicial proceedings. "[T]he fundamental separation of powers doctrine embodied in article III, section 3 of the California Constitution . . . forbids any such legislative usurpation of traditional judicial authority." (*Id.* at p. 547.)

The separation of powers doctrine has also been applied to restrict judicial tampering with the legislative prerogatives of administrative agencies. In *Sklar* v. *Franchise Tax Board* (1986) 185 Cal.App.3d 616 [230 Cal.Rptr. 42], the court found itself precluded from mandating the adoption by the Franchise Tax Board of regulations pertaining to the deductibility of expenses for alcoholic beverages, terming this a "legislative" decision. (*Id.* at p. 624.) A trial court's order to an agency with jurisdiction over airport lands was reversed upon a determination that it was too broad, and "impermissibly sought to judicially compel the performance of a quasi-legislative act by an administrative body." (*City of Coachella* v. *Riverside County Airport Land Use Com.* (1989) 210 Cal.App.3d 1277, 1293 [258 Cal.Rptr. 795].)

Relation of the general "separation of powers" doctrine to the Board's jurisdiction over IID is not answered, however, by these precedents—precedents which deal with "pure" governmental functions. The separation of powers concept was first evidenced in the governments that emerged from the American and French revolutions. Although even at these early times no true or complete separation was ever achieved, the three branches of government nevertheless existed in relatively pure form. (See 1 Davis, Administrative Law Treatise (2d ed. 1979) § 2:4, pp. 67-72.) Time has blurred the purity of division of governmental functions, however, particularly with the advent of administrative agencies. As stated in *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 142 [93 Cal.Rptr. 234, 481 P.2d 242]: "Possibly the most significant structural change in our government since the date of its founding has occurred in the twentieth century development of a huge administrative bureaucracy. To deal with the manifold problems of modern society these administrators have been delegated substantial quasi-legislative and quasi-adjudicative powers."

We here deal with the quasi-adjudicative *and* quasi-legislative regulation by the Board of the quasi-adjudicative and quasi-legislative activities of IID.

Does the simplistic concept of "separation of powers" have any application? Perhaps a closer focus on the agencies themselves will enlighten.

IID was organized in 1911 under enabling legislation adopted in 1897. (*Imperial Land Co.* v. *Imperial Irr. Dist.* (1916) 173 Cal. 660, 662 [161 P. 113].) The process of formation involved the presentation of a petition by landowners to the county board of supervisors, with the supervisors' approval formalized by recordation in the office of the county recorder. Thereafter the affairs of the irrigation district were to be governed by a board of trustees with the power to impose assessments on land (through disinterested commissioners), plan for irrigation works, and achieve construction, maintenance and repair of same. Included within the powers of the trustees was the power to condemn rights of way. (See Historical Note, 69 West's Ann. Water Code (1984 ed.) § 20500, pp. 35-37.) The original enabling statute was replaced in 1943 by a new statutory framework commencing with section 20500. We find no indication that the new statutory framework to any degree reduces the quasi-legislative and quasi-adjudicative discretion vested in irrigation districts.

For instance, "A district may do any act necessary to furnish sufficient water in the district for any beneficial use." (§ 22075.) It has the power to adopt regulations to assure equitable distribution of water (§§ 22085, 22085.5, 22086) and may take direct action to assure compliance with its rules (§§ 22081.5-22084.5). An irrigation district has been described as having "many express powers and also broad general powers." (25 Ops.Cal.Atty.Gen. 164, 165 (1955).) Irrigation districts, although not political subdivisions of the state, are public agencies performing governmental functions—agencies of the state and "subservient to it." (*In re Lindsay-Strathmore Irr. Dist.* (D.C.Cal. 1937) 21 F.Supp. 129, 134.)

The Board, unlike IID, is a political subdivision of the state. It is a part of the Resources Agency (§ 175), which in turn is one of the several principal administrative agencies of the state (Gov. Code, § 12800), responsible to and appointed by the Governor (Gov. Code, §§ 12801, 12802.5, 12850.4), and hence logically more a part of the executive branch than any other branch of government. Like many other federal and state agencies, however (see 1 Davis, Administrative Law Treatise, *supra*, § 2:5, p. 74 *passim*) the Board's powers and responsibilities are a blend of judicial, legislative and administrative concepts. Generally, it "exercise[s] the adjudicatory and regulatory functions of the state in the field of water resources." (§ 174.) It has investigative powers (§§ 1051, subd. (a), 1051, subd. (b)); it may determine disputes related to appropriation of water (§ 1051, subd. (c)) and has the power to issue and condition permits for appropriation (§ 1258); it deter-

mines conflicting riparian rights to use of stream waters (§§ 2500-2900); and it acts as a referee in water disputes when appointed by the court (§§ 2000-2076). Most relevant to our case, the Board has power to enforce the constitutional requirement of "reasonableness" in water use, and to investigate and act upon allegations of waste or misuse of water. (19 Pacific L.J. 957, as reprinted in Overview of California Water Rights and Water Quality Law, 68 West's Ann. Water Code (1971 ed., 1990 pocket supp.) XXIII, p. 957; *People* ex rel. *State Water Resources Control Bd.* v. *Forni*, *supra*, 54 Cal.App.3d at p. 753; Cal. Code Regs., tit. 23, §§ 4000-4007; *Imperial I*, *supra*, 186 Cal.App.3d at p. 1169.)

█ The case before us, then, is one involving a "line" water agency created to contract for water acquisition and delivery, to construct capital improvements, to assess water users, and to regulate water use within its district. Juxtaposed against this agency status is that of another agency, perhaps better described as "staff" in the sense that it delivers no water itself, but is charged with supervision of the water activities of other agencies. It is apparent to us that the very purpose of the Board was to serve as supervisor and regulator of the activities of actual water deliverers, at least in the specific areas delegated to it, such as the prevention of waste. Each agency is vested with detailed specific, and manifold implied, powers which partake of legislative, judicial and administrative powers. In these circumstances it seems implausible to assert that the supervision imposed by the Board violates "separation of powers."

There is, in fact, no theoretical "separation of powers" in the activities of these agencies. Although one (the Board) is directly under the supervision of the executive branch of government and the other (IID) is an independent and specialized agency, *each* is the creation of the Legislature. "[T]he powers of public [agencies] are derived from the statutes which create them and define their functions." (25 Ops.Cal.Atty.Gen., *supra*, 164, 165.) Having created both agencies, and having specifically given the Board supervision over water waste permitted by anyone in the state, including IID, it is nonsensical to say that the Board violates some theoretical concept of power separation when it exercises the very power given it.

We have labored long on this issue, perhaps because the philosophical concept of separation of powers is itself difficult to grasp. The short answer might have been better: simply that the concept of "separation of powers" has no application in this case because both parties are administrative agencies, both vested with regulatory and adjudicative powers, and hence there is no violation of any objective of separateness when one regulates the other.

## 2. *Alleged Errors in Adjudication*

### (d) *Incorrect Test of Agency Review*

■ IID contends that its decisions, under review by the Board, were quasi-legislative in nature, and that they should have been accorded deference by the Board, to be reversed only upon "clear and convincing" evidence.

IID here confuses, we believe, the standard of review appropriate for the Board with that which is proper for judicial review of quasi-legislative determinations of an agency.[3] Deference is required of reviewing courts with respect to such determinations of agencies because of the expertise and special delegation of responsibility to the agency. That is not the case here. Both IID and the Board are agencies with presumed expertise in the field of water use. Although IID is a venerable entity through whose canals has passed perhaps more water than has traversed any other man-made way, it cannot claim a corner on the expertise of "reasonable" water use. From the authorities cited above, and particularly our own prior decision in *Imperial I*, we conclude that the Board is *the* expert in that field. The Board had no call to defer to the decisions of IID in the field of water waste.[4]

### (e) *Lack of Disputants*

■ The initial investigation into IID water use was initiated by a complaint from a citizen whose lands near the Salton Sea were being flooded. That dispute was settled before rendition of Decision 1600. The Board's proceedings continued, however. Also, the Board's adjudication dealt with

---

[3] See, for instance, *Faulkner* v. *Cal. Toll Bridge Authority* (1953) 40 Cal.2d 317, 329 [253 P.2d 659] (court review of conclusions of agency after it has conducted factual hearing should give deference to the agency expertise); *Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690, 702 [166 Cal.Rptr. 331, 613 P.2d 579] (judicial review of quasi-legislative action of the Industrial Welfare Agency limited to determination of arbitrariness or entire absence of evidentiary support); *City of Chula Vista* v. *Superior Court* (1982) 133 Cal.App.3d 472, 485 [183 Cal.Rptr. 909] (judicial review of legislative activity limited to determination whether the agency acted within its delegated authority and whether its action was reasonable as opposed to arbitrary, capricious or lacking in evidentiary support); *Higgins* v. *City of Santa Monica* (1964) 62 Cal.2d 24, 31 [41 Cal.Rptr. 9, 396 P.2d 41] (judicial review of legislative action limited to determination as to whether it is " ' "palpably arbitrary and beyond rational doubt erroneous" ' ").

[4] See the parallel situation of the Board's exercise of power in connection with wastewater reclamation. In *Environmental Defense Fund, Inc.* v. *East Bay Mun. Utility Dist., supra*, 20 Cal.3d at pages 343-344, the Supreme Court noted the Legislature's intent to vest regulation in the Board, and advised that disputes relating to water reclamation should first be adjudicated by the Board, and that the courts should defer to Board expertise.

concerns much broader than the flooding of Mr. Elmore's farmland. The ultimate thrust of Decision 1600 was to require planning and implementation of measures to prevent waste of large amounts of water (at least 100,000 acre feet annually) for the benefit of people, generally, in the state— i.e., for the benefit of undetermined and unnamed future potential users.

IID claims that the continuance of the adjudication and the making of the order, in these circumstances, were error. IID points to the fact that all previous reported cases involving exercise of jurisdiction by the Board have dealt with actual disputes between identified and existing parties. There is, IID claims, no justiciable controversy here which permits the Board to interfere. The Board concedes that all prior cases have arisen from controversies between two or more water users, and hence that the instant case is unique.

The lack of specific precedent does not impair or preclude the Board's actions. The constitutional and statutory imperative is that the water resources of the state be put "to beneficial use to the fullest extent," and that "unreasonable use . . . of water be prevented." (§ 100.) *The* agency entrusted with the "orderly and efficient administration of the water resources of the state" is the Board. (§ 174.) In *United States* v. *State Water Resources Control Bd.*, *supra*, 182 Cal.App.3d at page 142, it was stated that "the Board has the separate and additional power to take whatever steps are necessary to prevent unreasonable use or methods of diversion [of water]." In our own previous decision in this case, *Imperial I*, we concluded that the Board had "adjudicatory authority in the matter of unreasonable use even to the extent of ordering [IID] to submit a plan to conserve water," and concluded that "the Board's authority includes the power to adjudicate the article X, section 2, issue of unreasonable use of water by IID." (*Imperial I*, *supra*, 186 Cal.App.3d at pp. 1170-1171.)

We did not particularly focus, in *Imperial I*, upon the lack of specific competing named parties in the case. Our holding, however, was broad and unlimited in describing the powers of the Board. We have found nothing in statutory or case authority indicating any intention on the part of the Legislature to limit the Board's adjudicatory powers to cases litigated by competing named parties. We believe the Legislature intended to vest the Board with power, on its own and at its own initiative, to investigate alleged water waste and to take appropriate remedial action.

(f) *Inconsistent Findings*

IID contends that all of the water introduced into its district is used for "beneficial" purposes, including the excess water which finds its way to the

Salton Sea. Such water prevents excessive salinization of the sea, protecting it as a fishery and wildlife sanctuary. It also finds beneficial use in the generation of electric power. There has never been, IID contends, an adjudication of constitutional misuse of water when the water is being beneficially used and there is no controversy between competing water users. Further, IID contends, both the Board and the attorney general have conceded that IID's use of water is "reasonable." Having made this concession, it is inconsistent and reversible error for the Board to reach a bottom-line conclusion of unreasonable use. IID's argument is bolstered, it contends, by the superior court's finding that "The Board did not find that IID's uses of water, in themselves, were unreasonable."

We believe IID has mischaracterized the Board's findings. The Board found (and IID does not dispute) that substantial losses of water resulted from canal spills, excess tailwater (the water running off the "tail" of a farm as the result of excess water being introduced at the "head" of the system), and other wasteful practices, such as canal seepage. Such runoff of water provided no alternative use for downstream users since IID's customers are at the end of the river, so to speak, the downstream being the Salton Sea. The totality of this waste of water was found by the Board to be "unreasonable and . . . a misuse of water." Admitting that fresh flow into the Salton Sea might have some temporary fishery benefit, the Board found it to be an unpersuasive factor in that "prolonged delay in water conservation measures would not save the fishery for an appreciable length of time."

IID is also in error in contending that all "beneficial" uses are by definition "reasonable." The Constitution requires not only that water use be "reasonable" but that "the water resources of the State be put to beneficial use to the fullest extent of which they are capable." Obviously, this mandate requires a comparison of uses. As stated in *Tulare Dist.* v. *Lindsay-Strathmore Dist.* (1935) 3 Cal.2d 489, 567 [45 P.2d 972], "What is a beneficial use, of course, depends upon the facts and circumstances of each case. What may be a reasonable beneficial use, where water is present in excess of all needs, would not be a reasonable beneficial use in an area of great scarcity and great need. What is a beneficial use at one time may, because of changed conditions, become a waste of water at a later time."

In *Joslin* v. *Marin Municipal Water Dist.*, supra, 67 Cal.2d at page 141, the court noted the limited water resources available to the state, and that "conservation [must] be exercised 'in the interest of the people and for the public welfare.'" These cases, along with others which have been cited above, note the evolution of water rights from a concept of absolute right of use to one of comparative advantage of use. The fact that a diversion of

water may be for a purpose "beneficial" in some respect (as for desalinization of lakes or generation of electric power) does not make such use "reasonable" when compared with demands, or even future demands, for more important uses.

### (g) *Excessive Mandates*

The tenor and taste of the appeal is that IID is being unfairly treated. It has occupied a position of strength, discretion and vested right in a geographical part of the country that is "far western," embracing a philosophy that is independent in every sense of the word. Recent trends in water-use philosophy and the administration of water law have severely undermined the positions of districts such as IID. IID's core complaint, if not completely valid, is at least understandable. It has been deprived of a great deal of the property rights which it thought were inherent in its allocation of Colorado River waters, made many years ago by federal and state statute and private contract. The loss of these rights undoubtedly will result in practical and monetary losses for IID and its customers. An obvious conclusion is that *Imperial I* and the rulings of the Board have eroded IID's bargaining position in terms of the sale of its water to other districts, such as the Metropolitan Water District.

IID's reaction to these reversals in bargaining power takes form in recondite ruminations about philosophical legal principles, such as the separation of powers argument; and is also evidenced by simpler and more practical complaints about the length and breadth of the Board's injunction. While the superior court concludes that all the Board has really done is require a little planning of IID, IID's perception of the matter is wholly different, viewing the Board's actions as next to sinister. We deal in this section briefly with several practical complaints which we gather under the heading of alleged "excessive mandates."

IID reviews its past record of activities designed to conserve water, reminding that in the last 20 years or so it has constructed four reservoirs, evaluated cost effectiveness, lined 732 miles of canals, constructed 6 additional units for power production, initiated conservation studies, and achieved water use efficiencies which are above average for comparable projects. IID itself has recognized the desirability of water conservation by adopting in January of 1984 a resolution calling for reduction of inflow to the Salton sea by 100,000 acre feet annually. In light of this evidence of responsible water trusteeship, IID finds the Board's mandates (such as item 1.2 of the Board's order, that IID require its water users to repair defective tailwater structures by a certain date in 1985) to be excessive.

A specialized category of criticism leveled by IID is that the Board's broad injunction overlooks the principle that it should have selected a less drastic but practical remedy, characterized as a "physical solution." A "physical solution" involves the application of general equitable principles to achieve practical allocation of water to competing interests so that a reasonable accommodation of demands upon a water source can be achieved. (See Hutchins, The California Law of Water Rights (1956) 351-354.) IID refers to the principle as a means of avoiding water waste without unreasonably or adversely affecting the rights of the parties (citing *City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199, 290 [123 Cal.Rptr. 1, 537 P.2d 1250]) and complains that the Board attempted no such practical resolution of this matter.

Finally, and mirroring other aspects of its presentation reflected above, IID complains that the Board, traditionally an investigative body and an arbiter of disputes between parties, has switched roles and embraced an unreasonable position of sua sponte policing of independent water districts. The Board, IID claims, has become "derailed," the result of which is an overbroad order not supported by substantial evidence.

Referring first to the specific contention regarding "physical solution": we accept the Board's rejoinding analysis, as set forth on pages 28 and 29 of Decision 1600. The concept of a "physical solution" is the accommodation of competing interests by the making of a Solomon-like decision which satisfies, to some reasonable degree, everyone's interest. The sine qua non of a physical solution is the existence of specific conflicting demands which can be arbitrated. That is not the case here, and no simple or expedient "physical solution" is possible. We observe, however, that in many respects the Board's decision *is* a physical solution. Decision 1600 certainly addresses physical and practical problems, and attempts to achieve resolution of same by means which it has concluded IID has the power to achieve without unreasonable expenditures.

■ Addressing the more general complaints of excessiveness, we can but refer to the function of this court, which is to review the record for substantial evidence supporting the trial court's affirmance of the Board. We have, we fear, already restated and reworked too much of the detail of this record. It is appropriate at this point to decline further recitation. Suffice it to say that the findings of the Board amply support the legal conclusions it made, as well as the orders it imposed. We have decided that the Board had jurisdiction to enter the field upon the legal and practical grounds it chose to occupy. Finding its conclusions and determinations to be well supported, we have no choice but to affirm them.

## Conclusion and Disposition

The trial court's judgment is affirmed.

We note from IID's brief that it has "engaged for three decades in costly and critical litigation about its water rights." It asks that we reverse all the lengthy deliberations that have preceded our hearing and requests even again an "opportunity to more extensively brief the issue."

All things must end, even in the field of water law. It is time to recognize that this law is in flux and that its evolution has passed beyond traditional concepts of vested and immutable rights. In his review of our Supreme Court's recent water rights decision in *In re Water of Hallett Creek Stream System* (1988) 44 Cal.3d 448 [243 Cal.Rptr. 887, 749 P.2d 324], Professor Freyfogle explains that California is engaged in an evolving process of governmental redefinition of water rights. He concludes that "California has regained for the public much of the power to prescribe water use practices, to limit waste, and to sanction water transfers." He asserts that the concept that "water use entitlements are clearly and permanently defined," and are "neutral [and] rule-driven," is a pretense to be discarded. It is a fundamental truth, he writes, that "everything is in the process of changing or becoming" in water law.[5]

In affirming this specific instance of far-reaching change, imposed upon traditional uses by what some claim to be revolutionary exercise of adjudicatory power, we but recognize this evolutionary process, and urge reception and recognition of same upon those whose work in the practical administration of water distribution makes such change understandably difficult to accept.

Work, Acting P. J., and Todd, J., concurred.

A petition for a rehearing was denied December 12, 1990, and appellant's petition for review by the Supreme Court was denied March 13, 1991.

---

[5] Freyfogle, *Context and Accommodation in Modern Property Law* (1989) 41 Stan. L.Rev. 1529, 1546-1547.